# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

--------------------------------------------------------------------------------------------------------------

Eleshea Reid, individually, Michael Matthews, individually, *and on behalf of all others similarly situated,*

Court File #: 24-CV-00368 (JWB/JFB)

                Plaintiffs,

**FIRST AMENDED**

**CLASS ACTION COMPLAINT**

        v.

**JURY DEMAND**

RealPage Utility Management, Inc., Stephen Scott Management, Inc., Cedar Pass South, LLC, Bader Management, Inc., YES Energy Management, Inc.

                Defendants.

--------------------------------------------------------------------------------------------------------------

## SUMMARY OF ACTION

1. This class action is brought against all Defendants for conspiring to enter into an illegal agreement (The Scam), to steal and cheat from Plaintiffs and the Putative Minnesota Rule 23 Class (residential tenants). Defendants conspired to charge bogus utility-based fees and other bogus charges when sending monthly billing statements to tenants.

2. The ulterior and illegal motive of the conspiracy is to con, confuse, mislead, misrepresent, deceive and trick tenants into believing that under the terms of the residential lease, a tenant purportedly 'consents' to bogus fees.

3. After bogus fees are past due and delinquent, Defendants engage in unlawful collection activities. They do not have a Minnesota license as debt collectors and their collections activities violate the Fair Debt Collection Practices Act (FDCPA).

1

4. Other unlawful activities include freezing a tenants' on-line rent portal. This prevents a tenant from paying the next month's rent. If bogus utility-based fees remain unpaid, Defendants keep the rent portal frozen. The tenant is not able to pay next month's rent, although willing, able and for some, desperate to pay rent and avoid eviction. However, the rent portal remains frozen until all bogus utility-based fees are paid.

5. If bogus fees are still not paid, the Landlord files an eviction complaint in Housing Court. The Complaint alleges that the tenant is purportedly in material breach of the lease by not paying rent but fails to disclose that it was the Landlord that prevented paying rent by freezing the rent portal.

6. Monthly billing statements from Defendants undisputedly include bogus fees. In contrast, monthly billing statements from Minnesota public utility carriers, such as CenterPoint Energy, undisputedly do not include bogus fees.

7. The Scam is lucrative. Monthly recurring utility-based bogus fees for each residential unit total about $244 annually. Other bogus fees include a one-time setup Administrative Fee of $150. Another bogus fee is alleged clean-up expenses of the unit after a tenant vacates the premises and allegedly destroys the property. For Plaintiff, bogus fees associated with just vacating the premises totaled $10,751.

8. The Scam is nationwide. RealPage on-line monthly billing serves over 2.5 million customers. This lawsuit makes claims for Plaintiffs and a putative Minnesota class.

9. Plaintiff Reid also brings a claim for housing discrimination. The Landlord failed to make reasonable accommodation to have a dog on the premise to help her cope with her disability.

## JURISDICTION, VENUE AND STANDNG

10.  This Court has jurisdiction pursuant to 15 U.S.C. §1692k(d), 28 U.S.C. § 1331, and

conspiracy-based jurisdiction, with supplemental jurisdiction of state law claims pursuant to

U.S.C. § 1367.

11.  Venue is proper pursuant to 28 U.S.C. § 1391(b). Defendants' acts and transactions that give

rise to Plaintiffs' claims occurred in this district, is where Plaintiffs reside, and where

Defendants regularly and continuously transact business, including over the Internet.

### Conspiracy-based Jurisdiction

12.  "There are generally two categories of cases where defendants are legally liable to plaintiffs

even though they have had no previous contacts with defendants: 1) when the defendant's

conduct is the result of a conspiracy; 2) where the plaintiff was injured by joint tortfeasors."

*Emig v. American Tobacco Co.,* 184 F.R.D. 379 (D. Kansas 1998).

13.  This district recognizes conspiracy-based jurisdiction. See, e.g., *DURAG Inc. v. Kurzawski,*

No. 17-cv-5325, 2020 WL 2112296, at *1 (D. Minn. May 4, 2020); *see also, Stangel v.*

*Rucker,* 398 N.W.2d 602, 606 (Minn. Ct. App. 1986) (discussing state law requirements for

conspiracy jurisdiction).

14.  Conspiracy-based jurisdiction is based on Minnesota's state long-arm statute and adopts the

three-part test common to district courts sitting in the Eighth Circuit. *See, Personalized*

*Brokerage Servs., LLC v. Lucius,* No. 05-cv-1663, 2006 WL 208781, at *5 (D. Minn. Jan.

26, 2006) ("[Plaintiff] must show '(1) the existence of a conspiracy; (2) the nonresident's

participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance

of the conspiracy within the forum's boundaries.'" *Kurzawski* acknowledges the State of

Minnesota and the Minnesota Supreme Court's long-arm statute's application of conspiracy-based jurisdiction over conspirators. See 2020 WL 2112296, at *5 (citing *Hunt v. Nev. State Bank,* 172 N.W.2d 292, 311 (Minn. 1969)).

## PARTIES

15. At all times relevant, Plaintiff Reid is a natural person, residing in Hennepin County, Minnesota, and a "consumer" as defined by the FCPA, FDCPA, and MN DCPA.

16. At all times relevant, Plaintiff Matthews is a natural person, residing in Hennepin County, Minnesota, and a "consumer" as defined by the FCPA, FDCPA, and MN DCPA.

**The Landlord**

17. On or about January 1, 2024, Stephen Scott Management, Inc. (Scott Management), Cedar Pass South, LLC (Cedar Pass South), merged and/or reorganized under a new entity, Bader Management, Inc. d/b/a as Bader, or Bader Companies (Bader), with a webpage: www.badercompanies.com.

18. "Bader" or "Bader Companies" is not registered with the Minnesota Secretary of State.

19. On information and belief, the reorganization was designed to shield owners, shareholders, and members from liability prior to reorganization, including liability for The Scam.

20. After reorganization and on information and belief, The Scam continues to operate as before but with the Landlord and related entities now operating as Bader, the principal co-conspirator, and with RealPage, and subsequently YES Energy as co-conspirators.

21. Prior to reorganization, Landlord and affiliated entities, on information and belief, failed to maintain separate financial assets and funding, were under-capitalized, disregarded corporate

formalities, and lack arms-length relationships among the related entities.[1]

22. Landlord and related entities have a unity of interests – engage in business activities to develop real estate, build multi-unit residential complexes to offer residential units for rent to the public, and engage in The Scam.

23. Before reorganization on or about January 1, 2024, and on information and belief, the lion's share of real assets (real property and buildings) were titled in Cedar Pass South, LLC (the Landlord). However, residential leases – one basis for liability for claims made in this Complaint, is executed between a tenant and an affiliated entity of the Landlord, Stephen Scott Management, Inc. ("Scott Management").

24. Pursuant to the lease executed by Scott Management, rent is paid to Scott Management through its on-line payment portal. On information and belief, rent payments (revenue) is passed through to Cedar Pass South LLC, which then deprives Scott Management of assets to satisfy any liability judgment from claims made in this Complaint.

25. Landlord and affiliated entities play a shell game to deliberately and intentionally under-capitalize Scott Management with insufficient assents to satisfy any judgment for liability in breaching the lease and The Scam.[2]

26. Public interest is served through this lawsuit. Landlord and its affiliates offer to the public about 10,000 residential units (apartment and townhomes) for rent in Minnesota. It is one of the largest landlords in Minnesota. Its policies and procedures impact the housing market.

---

[1] Evidence of alter ego, under capitalization, lack of individual identities of entity, and lack of individual and independent operation of each entity is in the exclusive possession of Landlord and its affiliates. This evidence is not available to be presented to the court until formal discovery of the Landlord's financial records, corporate minutes, control agreements and service agreements between Landlord and affiliated entities.

[2] Until formal discovery, Plaintiffs do not know whether the Landlord and/or its affiliates (and subsequently Bader) has sufficient insurance to cover a judgment from this lawsuit.

27. Plaintiffs and some members of the Putative Class reside in a building that is titled in the name of the Landlord, Cedar Pass South LLC as reflected in property tax records of Hennepin County. Exhibit 1, which is incorporated herein.

28. Before reorganization, residential leases with Plaintiffs and the Putative Class were executed by Scott Management. After reorganization effective January 1, 2024, renewal of leases and/or new leases are believed to be executed by Bader Management, Inc.

29. After Plaintiffs gave notice of claims against Defendants for The Scan and before this Complaint was filed, Landlord and affiliated entities reorganized as Bader Management, Inc., in part, to avoid liability for The Scam that occurred before reorganization.

30. On information and belief and after Plaintiffs gave notice of claims against Defendants for The Scam, the agreement for monthly billing services with RealPage was terminated.

31. Before reorganization, Cedar Pass South, LLC, d/b/a Cedar Pointe, with an assumed name of Cedar Pointe Rental Townhomes ("Landlord"), was a Minnesota domestic entity that engaged in business in Minnesota. Landlord owns the residential apartment complex property where Plaintiffs and some members of the putative Class reside as well as about 85 other residential complexes where other members of the putative Class reside.

32. Before reorganization, the Landlord's principal executive office address was located at Steven Scott Management, 3020 France Ave. South, St. Louis Park, Minnesota, 55416. The registered manager of Cedar Pass South, LLC was also located at Steven Scott Management, Inc. with its address also at 3020 France Avenue South, St. Louis Park, Minnesota 55416. Its registered office also was 3020 France Avenue South, St. Louis Park, Minnesota 55416.

33. Before reorganization, Defendant Cedar Point Pass South, LLC was affiliated with Cedar

Pointe Rental Townhomes, an assumed name of Cedar Pass Homeowners Association, as
name holder, with principal place of business address also at 3030 France Avenue South, St.
Louis Park, Minnesota, 55416. The name holder' s address is the same address.

34.  Before reorganization, Cedar Pass Homeowners Association was a domestic nonprofit
corporation, with Scott Bader as its registered agent, and registered offices also at
3020 France Avenue South, St. Louis Park, Minnesota.

35.  Before reorganization, Bader Development LLC was a domestic limited liability company
with Scott Bader as its registered agent and registered manager, with offices also at 32030
France Avenue South, St. Louis Park, Minnesota, 55416 and engaged in property
development in Minnesota, including Hennepin County.

36.  After reorganization, Bader Development LLC merged with Bader Management, Inc. with
the web page:  www.badercompanies.com.  This web page specifies that Bader does business
as Bader Companies. As of January 2, 2024, Bader Companies' web page specifies that it
manages nearly 10,000 residential units.

37.  After reorganization, Bader Diamond Funds and Bader Development merged with Bader
Management, Inc.

38.  As of January 2, 2024, a 'name search' on the Minnesota Secretary of State webpage did not
locate an entity as 'Bader: or "Bader Companies'.

39.  As of January 2, 2023, the web page: www.baderdiamondfunds.com is not accessible.

40.  Before reorganization, Stephen Scott Management, Inc. ("Scott Management") was a
Minnesota domestic corporation with Mark Jensen as chief executive officer. Its registered
offices and registered principal executive offices at 3020 South France Avenue, St. Louis

Park, Minnesota 55416.  Mark Jensen was Treasurer of Bader Development.

41.  Before reorganization, Scott Management engaged in management of residential property management in Minnesota, including Hennepin County. Scott Management and Landlord entered a business relationship (albeit interlocking/affiliated companies that operate as one) wherein Scott Management provides property and management services at the property where Plaintiffs and where some members of the Putative Class reside.

42.  Before reorganization, Steven Scott Development Company, Inc. ("Scott Development") was registered as a Minnesota domestic corporation, with Mark Jensen registered as Chief Executive Officer at 33020 South France Avenue, St. Louis Park, Minnesota 55416, with its registered office and registered Principal Executive Office Address also at the same address.

43.  Before reorganization, Scott Management rendered similar services to about 85 other multi-complex residential properties in the greater Twin City metropolitan area where other members of the Putative Class reside. Scott Management was one of the largest landlord residential property management providers in the greater Twin City metropolitan area.

44.  Upon information and belief, the Landlord is the owner of the land and buildings of these other 85 multi-complex residential properties.

45.  Scott Management recently reorganized and merged with Bader Management, Inc., which in turn consolidated with Bader Diamond Funds and Bader Development LLC, with an effective date of January 1, 2024.

46.  The Scott Management web page specifies that "effective January 1, 2024, Steven Scott Management, Bader Diamond Funds, and Bader Development will undergo a transformative rebrand and emerge as one, cohesive and all-encompassing company, Bader."

47. Before reorganization, Landlord and related entities had interlocking individuals on their respective Board of Directors and interlocking senior officers and senior management employees. These interlocking entities had the same principal executive office address, same registered office address, and interlocking managers.

48. Before reorganization, Mark Jensen was Treasurer of Bader Development and Chief Executive Officer and President of Stephen Scott Management, Inc.

49. Before reorganization, Scott Bader was a shareholder in both Bader Development and Stephen Scott Management, Inc.

50. Before reorganization, Sid Bader was a shareholder and Chief Executive Officer in Bader Development and a shareholder in Steven Scott Management, Inc.

51. Before reorganization and upon information and belief, these related entities operated as one although purportedly independent entities but nonetheless, all were engaged in The Scam. After reorganization, the Scam as Bader Management, Inc., Bader or/and Bader Companies.

**RealPage**

52. RealPage Utility Management, Inc. is a subsidiary of RealPage, Inc., ("RealPage"), (formerly American Utility Management ("AUM")) a Delaware corporation with its principal place of business in Texas.

53. RealPage is a third-party provider that provides multi-family management services, including billing and debt collections of rent and utilities, for third-party residential landlords and property management companies in Minnesota, nationally and internationally. These services are provided primarily through RealPage's Residential Utility Management (RUM), an on-line platform serving about 2.5 million residential units.

54. RealPage is a debt collector or "collector" as defined by 15 U.S.C. 1692a(6) and Minn. Stat. § 332.31(6). It collects consumer debts from Plaintiffs and the Putative Class.

55. RealPage is not registered with the Minnesota Secretary of State as a foreign entity engaged in any business activity in Minnesota.

56. RealPage does not have a Certificate of Authority to engage in any business in Minnesota.

57. RealPage is not licensed by the Minnesota Department of Commerce to engage in any third-party debt collections communications or activities and to receive any payments from those illegal communications and activities.

58. RealPage is a debt collector or debt collection agency under the FDCPA and MN DCPA.

59. RealPage is a co-conspirator and (until it was replaced by Yes Energy, as another co-conspirator) regularly and continuously engaged in illegal collections with Plaintiffs and members of the Putative Class though mail, email, and chat, and transmits thousands of monthly illegal collections communications pursuant to Minnesota residential leases and addenda executed by Minnesota residents in Minnesota.

60. The residential complex where Plaintiffs resided has about 151 residential units. Each has an individual meter for gas and an individual meter for electricity. RealPage minimally sends one billing statement per month that includes bogus fees. If the bogus fees are not paid after being past due, outstanding or delinquent, collection communications are included as part of the billing statements.

61. For tenants that reside at the same complex where Plaintiffs reside, RealPage and YES Energy regularly and routinely send by email or U.S. Mail about 1,812 annual illegal collection communications and receives payment of those illegal activities.

62. Before reorganization, Scott Management was on-site manager where Plaintiffs resided and at about 85 other multi-unit residential complexes. Upon information and belief, it entered into a purported third-party provider billing and collections agreements with RealPage. Subsequently, it entered into a similar agreement with YES Energy for a similar third-party agreement to continue to perpetuate the Scam.

63. Assuming these 85 complexes each have about 125 residential apartment or townhome units on average, RealPage and YES Energy regularly and continuously send out about 127,500 annual illegal collection communications to Plaintiffs and the Putative Class through the Internet or U.S. mail.

64. RealPage, a co-conspirator, was replaced by YES Energy, also a co-conspirator to continue to perpetuate the Scam as alleged herein.

**YES Energy**

65. YES Energy Management, Inc. ("YES Energy") is a Colorado entity with corporate headquarters in Santa Barbara, California.

66. YES Energy is not licensed by the Minnesota Department of Commerce to engage in any third-party collections.

67. YES Energy is a debt collector or "collector" as defined by 15 U.S.C. 1692a(6) and Minn. Stat. § 332.31(6).

68. YES Energy collects consumer debts from the Putative Class.

69. On information and belief, YES Energy, a co-conspirator, entered into a business relationship with Defendant Cedar Pass South, LLC, ("Landlord") and/or Scott Management to replace management services previously provided by RealPage to continue to perpetuate

The Scam, as specified herein.

70. Upon information and belief, YES Energy, subsequently entered into a business relationship with Bader Management, Inc. to perpetuate the Scan after Landlord's reorganization.

71. Before reorganization, Landlord and affiliates allegedly operate independently. In truth, they are alter egos of each other, operating as one. They failed to maintain discrete and independent operations. They had interlocking equity holders, boards of directors, and senior officers and managers. They were undercapitalized. They had the same registered offices, same registered agents, and over-lapping registered managers and senior officers.

**Conspiracy Agreement**

72. At all times relevant herein, all Defendants, individually and collectively, agreed to The Scam and its implementation. Some co-conspirators participate in some parts of The Scam while others participated in other parts. The illegal and ulterior motive of the Scam was to enter into an illegal agreement to accomplish the illegal purpose of stealing and cheating from residential tenants. Pursuant to The Scam, Defendants sent tenants monthly billing statements that included bogus utility bills. Implementation of The Scam included engaging in unlawful debt collections, unlawful freezing a tenant's on-line portal to pay rent, and filing unlawful eviction court complaints and conciliation court complaints for bogus fees and bogus destruction of property, and bogus fees for alleged unclean units when vacated and alleged destruction of the premises. Pursuant to the Scam, Defendants created an alleged Third-Party Agreement between the tenant and the public utility companies for gas and electricity, in which the tenant purportedly 'waived' their right to free monthly billing statements. Pursuant to the Scam, Defendants created boiler-plate lease agreements that

failed to specify all fees on the first page of residential leases, pursuant to Minnesota statutes, and created terms and conditions that are deceptive, misleading, and confusing to trick tenants into believing that they had no right or option but purportedly 'consent' to the bogus charges. Pursuant to the Scam, Defendant RealPage and subsequently YES Energy designed policies and procedures for their customer service call centers to dissuade and trick tenants to believing that the bogus fees were correct, legitimate, and without any recourse to dispute or request an investigation.

73. At all times relevant herein, each Defendant, individually and/or collectively as agent(s) of the principal (the Landlord), and in a representative capacity of other Defendants, and as co-conspirators, with agreement and ratification by other Defendants, entered into and agreed to the Scam to deliberately and intentionally commit statutory consumer fraud, common law fraud, misrepresentation, abuse of process, retaliation, and unlawful eviction and other violations of law as more fully specified in this Complaint to engage in deceptive, misleading, misstatement and omission of material facts and law to unlawfully steal and cheat from Plaintiffs and the putative class.

74. Whenever reference is made in the Complaint to any act of any Defendant, the allegation shall mean that the Defendant did the act alleged in this Complaint either personally or collectively, or as a co-conspirator, or through a Defendant's officers, directors, employees, agents or/and representatives acting within the actual or ostensible scope of their authority.

75. At all times mentioned herein, each Defendant knew or should have known that the other Defendant(s) were engaged in or planning to engage in the violations alleged in this Complaint.  Knowing this, each Defendant nevertheless facilitated the commission of those

unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts alleged in this Complaint, and thereby aided and abetted the other Defendants in the unlawful conduct.

76. Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint and continue to the present.

77. Whenever reference is made in this Complaint to any act of Defendant(s), that allegation shall mean that each Defendants acted individually and jointly with the other Defendants named in that cause of action.

78. Each Defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Additionally, some or all of the defendants acted as the agents of the other defendants, and all of the Defendants acted within the scope of their agency if acting as an agent of another.

79. Violations of law alleged in this Complaint occurred in Hennepin County, throughout Minnesota and elsewhere in the United States. The primary vehicle of the conspiracy is the monthly billing statements, which was transmitted through the Internet or U.S. mail.

## FACTUAL ALLEGATIONS

### A.    Summary of Key Allegations

80. Monthly billing statements sent to Plaintiffs from RealPage include bogus fees. Exhibits 3 – 7, attached to the Complaint and incorporated by reference herein. However, monthly billing statements sent to Plaintiffs from CenterPoint Energy (public utility carrier for gas) for the same residential unit for the same time period do not have any bogus fees. Exhibits 8 – 10,

attached to the Complaint and incorporated by reference herein).

81. Tenants are required to execute a take-it-or-leave-it lease. It purportedly includes an alleged 'waiver' to receive a no charge billing statements from the public utility gas and electricity carriers and is a purported 'consent' to the bogus charges.

82. Tenants are purportedly required to execute a Third-Party Agreement (between a tenant and its public utility carriers for gas and electricity). Plaintiffs allege that they did not execute such a document and if they did, it was under mistaken belief or they were misled, deceived or confused into executing the agreement. The agreement purportedly 'waives' a tenant right to receive the free billing statements from public utility carriers.  Instead, it purportedly is 'consent' to receive billing statements from Defendants, which include bogus fees.

83.  The Third-Party Agreement is not part of the lease. It was not merged or incorporated into the lease. It violates the 'entirety of the agreement' clause, which is included in the lease: "This agreement constitutes the entire agreement between the parties and supersedes all prior agreements, understandings, and discussions whether oral or written."

84.  Plaintiffs and the Putative Class did not receive any additional consideration to execute the Third-Party Agreement. It is not enforceable. Alternatively, it should be rescinded.

85.  Defendants conspired to collaborate in the design of residential leasing policies and procedures to reflect The Scan. They modified terms and conditions in the lease to reflect The Scam and create a veil of legitimacy and legality of the documents that a tenant is required to execute.

86.  Defendants engaged in illegal debt collection practices as part of the conspiracy. This

included filing and serving bogus eviction complaints in violation of federal and state debt collection practices pursuant to FDCPA §1692 *et seq.* and its state counterpart, M.S. § 332.31 *et seq.;* the Minnesota Prevention of Consumer Fraud Act ("CFA"), M.S. § 325F.68 *et seq.*; and related statutes and common law claims, including abuse of process, fraud, misrepresentation, breach of the lease, and retaliation.

87. RealPage is not registered to engage in any business activity in Minnesota. It is not licensed as a third-party debt collector in Minnesota. Failing to do so, RealPage is prohibited from sending Plaintiffs and the Putative Class: any collection communications, any notices and demands for any payment of any debt alleged as outstanding or delinquent, prohibited from receiving any payment from collection activities, and prohibited from threatening evictions.

88. YES Energy is not licensed as a third-party debt collector in Minnesota. Failing to do so, YES Energy is prohibited from sending Plaintiffs and the Putative Class: any collection communications, any notices and demands for any payment of any debt alleged as outstanding or delinquent, prohibited from receiving payment from collection activities, and prohibited from threatening evictions.

89. This litigation concerns utility billing for residential units with Single Meter, Single Unit. It does not concern a residential complex with a single meter for an entire residential complex and for which, a utility carrier sends a single bill for the entire complex to a landlord. The landlord then apportions the single bill to all units (Single Bill, Multiple Units).

90. "Merchandise" as defined by the PCFA encompasses services and real estate, which include residential leases. Plaintiffs are "consumers" under the PCFA. Effective August 1, 2023, amendments to the PCFA provide consumers with a private cause of action. Claims by

consumers for violations of the PCFA are statutorily defined as in the public interest.

91. Plaintiffs and the Putative Class detrimentally relied on material misrepresentations, deception, and omission of material facts and law to execute the residential lease and to sign-up for RealPage's unnecessary services.

92. Plaintiffs and the Putative Class detrimentally relied on material misrepresentations, deception and omission of material facts and law to execute the alleged Third-Party Agreement between the tenant and their respective gas and utility carriers.

93. RealPage and YES Energy charge many bogus utility-related fees and other illegal charges including: Administrative Fee of $150.00 upon executing the lease; bogus monthly "Admin. Fee" of about $4.40 to $5.00; bogus "Online Convenience Fee" of about $5.00 (RealPage to send a monthly e-bill statement to a tenant); bogus "Late Payment Fee" of about $8.00; and bogus "Utility Recovery Charge" of about $8.00. Exhibits 3 -7. For Plaintiffs, these bogus fees for about a 12-month period totaled about $244.80, plus the one-time Administrative Fees of $150. Exhibit 2. Bogus Move-Out Charges, including cleanup charges after vacating units; destruction of equipment, furnishings, property; and future rent charges. Defendants routinely fail to refund rent or pet deposits. For Plaintiffs, bogus Move Out Charges totaled $9,751.54.

## B.   SPECIFIC FACTUAL ALLEGATIONS

### 1.   Unlawful debt collections

94. Plaintiffs rented a residential townhome at 11352 CedarPointe Drive North, Minnetonka, County of Hennepin, Minnesota 55305 from Landlord and property owner, Defendant Cedar Pass South LLC, through a residential lease agreement executed with Landlord's agent and

property manager, Scott Management, on November 2, 2022.

95. Similar leases and addenda were executed by members of the Putative Class that reside at the same property complex as Plaintiffs and at other properties the Landlord owns (about (10,000 residential rental units) and managed by Scott Management (about 85 residential multi-complexes).

96. As part of the illegal conspiracy agreement, RealPage executed a third-party vendor/supplier agreement with the Landlord through its agent and property manager, Scott Management, for monthly billing services and to engage in debt collection services.

97. On information and belief, Scott Management executed similar agreements with RealPage for other Landlord properties where some members of the Putative Class reside.

98. RealPage is not registered with the Minnesota Secretary of State as a foreign entity to engage in any business activity in Minnesota.

99. RealPage does not have a duly issued Certificate of Authority to engage in any business activity in Minnesota.

100. RealPage does not have a duly registered agent for service of process as required by Minn. State. Stat. § 303.03.

101. RealPage is not registered with and does not have a license from the Minnesota Commerce Department to perform any activity or any service as a third-party debt collector as required by the Minnesota Collections Agencies Act, Minn. Stat.§ 332.31 *et seq.* Accordingly, any debt collections communications or activities violate both M.S. § 332.31 *et seq.* and the FDCPA, 15 U.S. C. § 1692 *et seq.*

102. Similarly, YES Energy is not registered with and does not have a license from the

Minnesota Commerce Department to perform any activity or any service as a third-party debt collector as required by the Minnesota Collections Agencies Act, Minn. Stat.§ 332.31 *et seq.* Accordingly, any debt collections communications or activities violate both M.S. § 332.31 *et seq*. and the FDCPA, 15 U.S. C. § 1692 *et seq.*

103.    Neither RealPage nor YES Energy are parties to any residential lease executed by Plaintiffs or the Putative Class at issue in this litigation.

104.    On information and belief, neither RealPage nor YES Energy have any equity interests in Landlord or Scott Management.

105.    On its web page, RealPage advertises its services to landlords and their property management agents as a "one-bill convenience for your residents. One powerful platform for your business. Uncover hidden revenue, boost collection rates, and increase NOI with the industry's most advanced utility billing services platform." https://www.realpage.com/utility-management/billing/ (Last viewed on December 1, 2023).

106.    Landlords and their property management agents, including Scott Management and YES Energy, generally do not engage in any collection efforts because virtually all collection "communications", as that term is defined by the FDCPA, are done by RealPage or YES Energy on behalf of Landlords and their property management agents.

107.    RealPage and YES Energy directly and regularly send standard 'form billing statements and standard 'form letters' to Plaintiffs and Putative Class members for currently due, delinquent, and outstanding rent, including usage/consumption charges for gas and electricity utilities. The billing statements include usage/consumption charges for water, sewer and trash (which are not at issue in this litigation). Significantly, billing statements include bogus

administrative fees, late fees, and other charges, which are at issue.

108.   Scott Management directly receives rent payments through its on-line payment portal (rent portal) for amounts billed by RealPage or YES Energy.

109.   RealPage or YES Energy directly receives utility consumption payments, administrative fees, late fees, and other charges for currently due as well as delinquent or outstanding, through the RealPage on-line payment portals (utility portal).

110.   RealPage and YES Energy directly and regularly engage in unlawful collection activities for delinquent and outstanding usage/consumption utilities payments and bogus utility-related fees and other fees. Some of these bogus fees are denominated as a monthly "Admin Fee", "Convenience Fee", "Late Payment Fee", "Utility Recover Charge", "One-time Activation Fee" and "One-time Administrative Fee."

111.   RealPage and YES Energy directly and regularly bill Plaintiffs and Putative Class members for usage gas and electricity, plus bogus late fees and other charges associated with these two utilities pursuant to the tenant alleged 'consent' in the lease.

112.   Alternatively, a tenant purportedly executes an alleged Third-Party Agreement between their gas and electricity utility carriers. It is an alleged consent for RealPage billing, adding bogus fees, collecting bogus fees and collection activity fees.

113.   Billing statements from RealPage or YES Energy involve consumer claims under the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.68-70 in connection with the sale of merchandise in Minnesota to a consumer, which includes amounts due in a residential lease and a consumer debt as defined by the FDCPA and MN DCPA.

114.   RealPage and YES Energy activities with Plaintiffs and the Putative Class members are

dedicated to the business of 1) collecting for landlords and their property managers, and

soliciting from tenants, payments for consumer claims; 2) giving, selling attempting to give

or sell to landlords, and using, for collection of those consumer claims, a series or system of

forms or letters that indicate directly or indirectly that a person other than the owner is

asserting a consumer claim; and 3) employing the services of an individual or business to

solicit or sell a collection system to be used for collection of those consumer claims.

115.    RealPage and YES Energy employes numerous persons to market and sell to landlords

and their property management agents its billing and utility collection systems, which

RealPage used and continues to use to send bills at issue in this litigation to Plaintiffs and

Putative Class. RealPage advertises that its utility billing system will "boost collection rates."

116.    In particular, Real Page and YES Energy send bills to Plaintiff and Putative Class

members to demand payment of delinquent and outstanding amounts due for rent, usage

utilities charges, including fees denominated as Admin Charges, Convenience Fees, Late

Fees, Utility Recover Charges, One-time Activation Fees, and One Time Administrative Fee.

117.    By undertaking its activities, including billing and collections of delinquent and

outstanding "debts", RealPage and YES Energy are engaged as a "debt collector" to collect a

"debt" by "communicating" with a "consumer" as these terms are defined by the FDCPA, 15

U.S.C. § 1692, and Minn. Stat. § 332.31 *et seq.*

118.    In particular, the RealPage two-page standard billing template includes: below the

header, "Billing Support" with the phone number and web page; Amount Due, Date Due,

Billed Charges, Billed Charges Due, and Amount Due. The second page specifies that this

"bill is not from …[specifying respective gas and electricity utilities]. It also specifies in

larger fonts "Simpler, Safer Utility Bills" and below that, "Conserve your energy with eBill."

119. On information and belief, YES Energy billing statements are similar to RealPage.

120. RealPage is a "Collection Agency" under Minn. Stat. § 332.31 Subd. 3: any person

engaged in the business of collection for another any account, bill, or other indebtedness.

121. YES Energy is a "Collection Agency" under Minn. Stat. § 332.31 Subd. 3: any person

engaged in the business of collection for another any account, bill, or other indebtedness.

122. RealPage and YES Energy, when making initial contact with Plaintiffs and the Putative

Class, failed to provide the following notice: "This collection agency is licensed by the

Minnesota Department of Commerce", which is required by Minn. Stat. § 332.37(21).

123. RealPage and YES Energy employes the services of individuals to sell to multifamily

housing owners (landlords) and their property manager agents, its collection system,

software, and services for collection of residential utilities and associated fees and charges.

124. RealPage has never owned any claim for payment or delinquent or outstanding amounts

due that it bills to Plaintiffs and Putative Class Members in Minnesota.

125. YES Energy has never owned any claim for payment or delinquent or outstanding

amounts due that it bills to Plaintiffs and Putative Class Members in Minnesota.

126. RealPage is not related by common ownership with landlords or property managers on

whose behalf RealPage engages in utility billing in Minnesota.

127. YES Energy is not related by common ownership with landlords or property managers on

whose behalf YES Energy engages in utility billing in Minnesota.

128. RealPage is dedicated to collections, directly and indirectly, of debts including usage of

utilities from residential tenants for its landlord and property management customers.

RealPage advertises that its services result in the collection of charges for utilities.

129.    YES Energy is dedicated to collections, directly and indirectly, of debts including usage of utilities from residential tenants for its landlord and property management customers.  On information and belief, YES Energy advertises that its services result in the collection of charges for utilities.

130.    The primary purpose of RealPage's and YES Energy utility billing businesses is to perpetuate The Scam to illegally induce tenants to pay for utility charges alleged owned to third-party landlords and their property managers.

131.    RealPage and YES Energy intend to induce Plaintiff and Putative Class members to pay utility charges allegedly owned to third-party landlords and their property manager agents through its billing practices and the actions described in this Complaint. RealPage and YES Energy utility billing works as a collections process. Both regularly send template utility bills to Plaintiffs and each Putative Class member each month. Every class member must pay the bogus utility charges and other fees or risk eviction.

132.    RealPage and YES Energy collect and seek to directly and indirectly collect consumer debts from Plaintiffs and the Putative Class in Minnesota by taking actions, including using a collection system to obtain data concerning the amounts of utilities charged by utility carriers, reformatting this data into its standard template billing statements and letters, sending these bills and other communications to Plaintiffs and the Putative Class, demanding payment, engaging in collection activities for amount delinquent and outstanding, assessing improper and illegal charges and fees as described in this Complaint and directly receiving payments through its on-line payment portal (utility portal).

133.   RealPage and YES Energy are not registered and do not have licenses from the Minnesota Commerce Department as a debt collection agency, a debt buyer or debt collector as required by Minnesota Statute 332.33 *et seq. inter alia* -- no person shall conduct business in Minnesota as a collection agency or debt buyer without having first applied for and obtain a collection agency license. Both are per se out of statutory compliance and are not permitted by statute to engage in any collection activity in Minnesota. Both should be enjoined from engaging in any further collection activities in Minnesota until duly compliant.

134.   Neither RealPage nor YES Energy can operate as a debt collection agency to lawfully bill Plaintiffs or the Putative Class to induce payment of any debt, or otherwise directly or indirectly seek to collect debts alleged owed to the Landlord, its management agent or for RealPage or YES Energy to receive any payments for any of these activities.

135.   RealPage and YES Energy unlicensed status means they cannot charge Plaintiffs and Putative Class for any fee(s) associated with unlawful and unauthorized collection actions.

136.   RealPage and YES Energy communications fail to conform to statutory requirements on content, format, required notices, including for example: "this communication is an effort to collect a debt." None of RealPage and YES Energy initial or subsequent communications include statutory required notices of procedures to verify a debt, dispute a debt, and the like.[3]

137.    RealPage and YES Energy unlicensed status means that they cannot engaged in any collection "communications" with Plaintiffs and the Putative Class. Nor can they collect or receive any money from Plaintiffs and the Putative Class. RealPage and YES Energy are not entitled to be paid for undertaking an unlawful course of business in Minnesota. All

---

[3] Similarly, Landlord's counsel initial communications to Plaintiffs through counsel did not include statutory required notices. Plaintiffs reserve the right to amend the Complaint to address this issue after discovery.

Administrative Fees and other fees and charges that are charged to Plaintiff and the Putative

Class that were imposed by RealPage and YES Energy must be refunded or disgorged.

138.   RealPage and YES Energy communications are collection efforts of "consumer claims"

under Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69 because

collection of a debt for "merchandise" includes residential leases.

139.   RealPage and YES Energy are not entitled to assess, charge, or collect any

Administrative Fees that are imposed to pay RealPage and YES Energy for collection

activities, when neither are licensed as a collection agency and not licensed to engage in

utility billing or any other consumer debt collection activity.

140.   The Minnesota Prevention of Consumer Fraud Act was relied on by the Minnesota

Attorney General to file a civil complaint against a Minnesota residential landlord for

allegedly stripping Minnesota consumers (tenants) of their legal rights through illegal and

deceptive rental practices for an eviction-for-profit scheme by misleading tenants of their

statutory rights, including billing and collecting for illegal late fees. *State of Minnesota v.*

*Steven Meldahl et al.,* 27-CV-16424, (Hennepin County Dist. Ct. 9/30/2019).

141.   The Minnesota Collections Act prohibitions persons and entities from doing business as a

collection agency without a license is designed to protect interests of consumer debtors who

are subject to collection activity by collection agencies and to prohibit collection agencies

from using abusive and unfair debt collection practices. In its transactions with Plaintiffs and

Putative Class, RealPage and YES Energy uniformly and systematically failed to comply

with and violate requirements of this and other statutes.

142.   Plaintiffs and Putative Class members that reside at the same residential complex have

their own individual meters for gas and electricity (Single Meter, Single Unit).

143.   Single Meter, Single Unit is distinct from a multi-unit residential complex with a single meter. In the latter, Landlords receive a single bill from a utility carrier for the entire complex (Single Meter, Multiple Units) and apportions the single bill among all units. This lawsuit concerns Single Meter, Single Unit.

144.   RealPage and YES Energy are not required to do any allocation of gas or electricity bills from public utility carriers for Single Meter, Single Unit residences. They merely reformat and reprint the same individual unit bills received from gas and utility carriers but add bogus charges. RealPage and YES Energy do not add value to justify bogus charges.

145.   Some bills sent by RealPage and YES Energy to Plaintiffs and the Putative Class and on information and belief, some amounts billed for underlying usage charges are higher than amounts billed by the gas and electricity utility carriers. Defendants do not give tenants the right to dispute or provide a meaningful investigation process to challenge the bogus fees or the underlining usage charges for gas or electricity consumption under Single Meter, Single Unit premises.

146.   When RealPage and YES Energy directly and indirectly collect and seek to collect delinquent or outstanding rent, delinquent or outstanding utilities and associated bogus charges and other fees from Plaintiffs and the Putative Class, they are engaged in illegal collection activities.

147.   RealPage and YES Energy unlicensed actions as a debt collection agency cause and continues to cause damage to Plaintiffs and the Purported Class as a result of their multiple violations of the FDCPA, CFA, MHRA, related statutes, and common law.

148.    Damages include, but are not limited to, a victim of illegal collection activities, extortion to make payments for bogus collection-related fees and charges, financial distress and anxiety from the inability to make these illegal payments, risk or face actual eviction, emotional and psychological injuries, including stress, distress, trauma and anxiety with physical manifestations such as headaches, migraines, inability to sleep, weight gain/loss, aggravation of pre-existing PTSD, as well as financial hardship and injuries by in part diverting monthly cash for daily living expenses to pay bogus fees or face eviction with insufficient cash to pay other necessary monthly financial obligations.

149.    For those evicted, injuries and damages include facing a public record of eviction for alleged non-payment of rent. This in turn creates similar financial, emotional and psychological distress as specified herein as well as financial distress in difficulty to find on short term notice another rental unit, especially without the timely return of rent deposits from Landlord. A record of eviction for nonpayment also creates credit impairment for bad credit and in turn increases credit card interest rates and commercial loan interest rates for "bad credit" as a result of a public record of eviction for nonpayment of rent.

150.    Defendants' illegal conspiracy and illegal agreement to scam Plaintiffs and the Putative Class includes 8 implementation steps:

**Step 1: Veil of legitimacy and legality of legal documents**

151.    All Defendants, except YES Energy,[4] conspired and entered into the initial illegal agreement to scam Plaintiff and the Putative Class. They designed residential lease policies

---

[4] Although YES Energy was not part of the initial agreement, upon information and belief, it ratified, accepted and continue to engage in the same illegal practices in pursue to The Scam as alleged against RealPage herein as a co-conspirator.

and procedures to conform to The Scan. They modified the lease agreement and addenda to

conform to The Scam. They created a purported Third-Party Agreement (between a tenant

and its gas and electricity carriers) in which the tenant allegedly consented for Defendants to

send monthly billing statements, to bill and to collect bogus fees.

152.    These changes in policy and procedures, the lease and addenda, and the Third-Party

Agreement violate federal and state debt collection practices pursuant to FDCPA §1692 *et*

*seq.,* Minnesota Collections Agencies Act, Minn. Stat.§ 332.31 *et seq.,* the Minnesota

Prevention of Consumer Fraud Act ("CFA"), M.S. § 325F.68 *et seq*.; and related statutes and

common law rights, including abuse of process, fraud, fraudulent misrepresentation, material

breach of the residential lease, and retaliation for Plaintiffs and the Putative Class of giving

Defendants notice and complaining of the bogus fees.

153.    Defendants intentionally, deliberately and maliciously omitted material facts to Plaintiffs

and the Putative Class when executing the lease. They omitted existing and material facts

known to Defendants – a tenant can get a billing statement from their gas and utility carrier

at no cost. They combined this nondisclosure with disclosure of other material facts that

misrepresent, mislead, and deceive tenants of their legal rights which are in part specified in

the lease agreement and addenda, the Third-Party Agreement, and in verbal discussions.

They tricked Plaintiffs and the Putative Class to believe that RealPage is lawfully engaged to

do business in Minnesota (although it does not have a Certificate of Authority), is licensed to

engage in third-party collection activities (although not duly licensed), can receive payments

for debt collection (which it cannot), charge for collection activities (which it cannot), and

that the legal documents executed are legitimate and legal (which they are not).

**Step 2:  The trap is set**

154.   The take-it-or-leave-it residential lease agreement and addenda and alleged policies and procedures are designed to spring the trap and create the guise of legitimacy and legality, providing legal cover of the alleged consents and legality of bogus charges.

155.   Alternatively, Defendants created an alleged Third-Party Agreement (between a tenant and its respective gas and utility provider). This agreement is another purported consent for RealPage to send a tenant billing statements for underlying gas and electricity consumption charges and bogus fees and other fees. The purported Third-Party Agreement is not integrated into and not part of the lease/contract agreement and addenda.

**Step 3:  Bogus fees and other charges are billed**

156.   RealPage and YES Energy send monthly billing statements to Plaintiffs and the Putative Class for underlying usage/consumption of gas, electricity, water, sewer, and trash. These underlying usage charges are not at issue in this litigation. However, bogus charges that RealPage and YES Energy adds are at issue.

**Step 4:  No remedy but pay bogus fees**

157.   When Plaintiffs and the Putative Class question or dispute billing statements, including bogus fees, RealPage customer service (call center) employees routinely represent that nothing can be done -- that all charges are proper. There is no meaningful review of a complaint or appeal process. There is no investigation process for a disputed charge. After expiration of a due date, RealPage considers the bill outstanding or delinquent.

**Step 5:  Illegal debt collection starts – The rent portal is frozen**

158.   RealPage initiates collection communications through template 'form letters' and/or

template monthly invoices/statements sent by US mail, email, or posted on the tenant's on-line utility portal. The written communications threaten collections, including threats to shut-down tenant's rent portal and threats of eviction.

159.    At the time of shutting-down (freezing) the rent portal, no rent is due and owing. Key to The Scam is that shutdown unlawfully prevents a tenant from paying next month's rent.

160.    The initial collection communication fails to notify a debtor, in statutory required fonts and size, that the communication is an effort to collect a debt and results from those efforts will be used to collect the debt. It also fails to notify the debtor that if disputed, the debtor has a right to dispute the validity debt, get validation of the debt, and to know of and follow a process to resolve a disputed debt. It fails to notify the debtor in the initial communication that the debt collector is licensed in Minnesota as a debt collector or collection agency.

161.    The rent portal remains shut down until all bogus fees are paid. Time ticks on. Next month's rent eventually becomes due. It is significant that no rent is due when the portal was initially shut down. The Landlord refuses to reopen the rent portal until all bogus utility fees are paid. The insidiousness of The Scam is that inability to pay rent is solely in the hands of the Landlord and caused entirely by the Landlord by shutting down the rent portal for not paying the bogus utility fees, even though a tenant is desperate to pay rent to avoid eviction.

**Step 6:  Illegal eviction**

162.    Notice of eviction is served followed by filing and serving a summons and eviction complaint. A primary ground alleged is material breach of lease for nonpayment of rent. The eviction complaint lacks candor and constitutes fraud. In part, it fails to specify that rent payment is impossible because it was the Landlord that froze the rent payment portal.

30

163.    There is no material breach of the lease to warrant eviction for nonpayment of rent. There was only a nonmaterial breach of the lease – failure to pay nominal and bogus utility fees, which also are disputed. The lease specifies a material breach for non-payment of rent occurs after five late payments of rent within a 12-month period.

164.    Landlord serves and files eviction complaints routinely after the first rent payment is deemed late, not after five late payments within a 12-month period. An unsophisticated tenant does not know that freezing of the rent portal is illegal or that there is a legal distinction of not paying rent (a material breach) in contrast to paying rent late (a mere non-material breach). These predicate issues are conveniently not presented to Housing Court. Default judgment is usually entered since there is typically no appearance by a tenant. The Scam does not see the light of day in Housing Court.

**Step 7: Rent deposit is withheld. Tenants charged bogus fees when vacating premises.**

165.    The Landlord routinely refuses to refund lease deposits. It also charges bogus Move Out Charges after the premises are vacated. Bogus charges include alleged cleaning, alleged destruction of household equipment and appliances, alleged destruction of furnishings and/or property, and future charges for rent until the unit is re-rented.

166.    Scott Management sent a Move Out Demand Letter to Plaintiffs on September 28, 2023 with a demand for $9,751.54 in bogus Move Out Charges.

**Step 8: Illegal Conciliation Court complaints filed**

167.    Even after eviction, The Scam continues. The Landlord typically threatens and then files and serves a Conciliation Court complaint to collect the bogus Move-Out Charges. To add insult to injury, Landlord demands payment for costs, disbursements, and attorney fees. Most

Conciliation Court complaints are decided by default. Landlord enforcement ensues and typically includes filing of liens and wage garnishment and part of Plaintiffs and the Putative Class claims for injuries and damages.

### 3. Allegations of deception, misrepresentation, fraud and unilateral omission of material facts

168.    During Plaintiffs' sign-up and move-in process, Scott Management employees failed to raise the topic of utility registration. Plaintiffs reasonably relied on their prior experiences with past Landlords - when utility registration is not raised by a landlord, the landlord usually takes care of those registrations.

169.    Plaintiffs did not receive a copy of the lease until the actual move-in date on November 2, 2023.[5]

170.    When the lease was dropped-off during move-in, it did not include a purported Welcome Package.

171.    Scott Management claims that the Welcome Package includes a purported Third-Party Agreement between a tenant and their respective utility carriers, Excel Energy and Center Point Energy.[6] The Welcome Package (a one-page document) was provided by the Landlord's counsel in litigation during the two unlawful detainers. It is attached and incorporated by reference herein as Exhibit 2.

172.    In an email from Landlord's manager, Steve Durst, on March 24, 2023, to Plaintiffs' Counsel specified: "At the move in closing, the residents sign a 3rd party agreement with the

---

[5] The Parties dispute whether Plaintiffs received a complete and true copy of the lease and addenda at move-in, the Welcome Package, and the purported Third-Party Agreement.

utilities saying that they are the new residents in the unit. Those agreements are then sent to the respective utilities so that they are ready for the registration when the resident calls."

173.    Plaintiffs do not recall executing any such Third-Party Agreement. If they did, no copy was received. Alternatively, the Third-Party Agreement was executed under unilateral misrepresentation of an existing material fact, fraud, deceit, confusion, and trickery.

174.    Plaintiffs' counsel requested a copy of the purported Third-Party Agreement from the Landlord's counsel. It was not produced.

175.    Nowhere on the Welcome Package is there a reference to the alleged Third-Party Agreement. The Third-Party Agreement ostensibly authorizes RealPage to bill a tenant for gas and electricity bills, for RealPage to receive those funds, and for RealPage to engage in collection activities.

176.    Relative to the gas and electricity companies, the Welcome Package merely directs a tenant to 'put in' their name for those services, which is an ambiguous instruction.

> "Excel Energy – electric service put in your name [adding contact information]"

> "Center Point Energy – gas service put into your name. [adding contact information]"

> Exhibit 2. The Welcome Package is not a document that a tenant executes.

177.    The only reference to RealPage in the Welcome Package relates to water, sewer, and trash:

> "RealPage – formerly known as American Utility Management (UAM) to have water, sewer and trash removal put into your name [adding phone number]"

*Id.*  These consumption/usage charges are not at issue in this litigation.

178.   RealPage merely reformats the same usage/consumption and corresponding charges it
receives from each tenant's individual unit meter (sent to Landlord by the utility carriers),
adding various bogus additional charges fees and other charges that are denominated as an
"Admin Fee" of about $4.40, "Convenience Fee" of about $5.00, "Late Payment Charge" of
about $8.00, "Utility Recover Charge" of about $8.00 to $16. "One-time Activation Fee" of
about $12.00, and "One-time Administrative Fee" of about $150. On information and belief,
YES Energy does the same.

179.   Gas and electricity utility carrier monthly billing statements sent directly to a tenant do
not include bogus charges that are specified in the above paragraph.

180.   Many bogus fees are not specified on the first page of the lease as required by Minn. Stat.
§ 504B.120.

181.   Third-Party Agreement, the Lease Agreement and Addenda, and conversations between
Scott Management employees as well as conversations between RealPage's customer service
center employees and Plaintiffs and the Putative Class are part of The Scam.

182.   The Scam is intentionally, deliberately, and maliciously designed to mislead,
misrepresent, confuse and coerce Plaintiffs and the Putative Class to either execute the lease
and/or the Third-party Agreement to allegedly waive and strip away tenant rights and
remedies.

183.   The purported Third-Party Agreement is a "take-it-or-leave-it" lease between a very
sophisticated Landlord and unsophisticated tenants that do not understand their rights and do
not have the financial means to hire a lawyer to engage in arms-length negotiations.

184.    There were and there are no negotiations with Plaintiffs and the Putative Class and Scott Management on any material term of the lease or Third-Party Agreement.

185.    When executing the lease and purported Third-Party Agreement, Plaintiffs were not informed of the specific amounts of various bogus fees.

186.    When executing the lease and purported Third-Party Agreement, Plaintiffs were not informed that billing statements from their gas and utility carriers that are directly sent to them do not include any of the bogus charges.

187.    When executing the lease and purported Third-Party Agreement, Defendants knew that gas and utility carriers do not include the various bogus charges that Defendants include in the lease and/or the purported Third-Party Agreement.

188.    When executing the lease and purported Third-Party Agreement, Defendants knew that most, if not all tenants, would not agree to RealPage monthly billing statements (with bogus fees) but opt for free billing statements from their gas and electricity utility carriers and not incur bogus charges that are billed and collected by RealPage.

189.    No additional consideration was provided by Plaintiffs and the Putative Class to execute the purported Third-Party Agreement.

190.    The lease specifies: "This lease constitutes the entire agreement between the parties and supersedes all prior agreements, understandings and discussions whether oral or written."

191.    The Third-Party Agreement is not part of the lease agreement or an addendum since it is not included in the list of addendums that are specified in the lease.

192.    Alternatively, and if the Third-Party Agreement exists, it was not executed by Plaintiffs or by Putative Class. If executed, it was by trickery, connivance, deception, material

misrepresentations or omission of material facts by Defendants.

193.    Many material terms and conditions in the lease and addenda are confusing and/or

ambiguous. An example of ambiguity is deciding when late payment of rent is a material

breach that subjects a tenant to immediate eviction. Paragraph A. RENT of the lease

specifies that rent is due before midnight on the first day of each month. Ambiguously, and

further in the same Paragraph A is specified: "Any amount (whether for rent or other

charges) is due when Management asks for it."

194.    More confusing and ambiguous language is found further in the same Paragraph A which

specifies that 5 late payments in a 12-month period constitutes a material violation to evict:

> "WARNING: Chronic or repeat late payment of rent creates additional
> burdens and administrative expense for Management even when all late fees
> are paid. Resident is put on notice that repeat late payment of rent is
> considered a material violation of lease and is a basis for Management to
> refuse to accept a future late payment, even with a tendered late fee, and to
> proceed with an eviction action for repeat late payment of rent, or to non-
> renew a Lease at the end of the Lease term. **More than 5 late payments in
> any 12-month period is considered a material violation of Lease and a
> basis for eviction and/or termination/non-renewal of Lease at the end of
> the Lease term.**" (emphasis added).

195.    Five annual late rent payments within a 12-month period is required for a material

breach. But just six days after September 1, 2023, the Landlord filed and served Eviction

Complaint Two alleging nonpayment of September's rent. The complaint failed to specify

that Plaintiffs failed to pay rent late five times within a 12-month period.

196.    Eviction Complaint Two was retaliatory and an abuse of process.

197.    There is more ambiguity in the lease. It specifies that non-payment of utilities is a breach

(non-material) in contrast to a material breach (nonpayment of rent to warrant eviction).

   **A. RENT, 6. PAYMENT OF UTILITIES**: Resident must pay the utilities

that Resident is responsible for under the terms of this Lease. Failure by Resident to pay utilities or a shut off in service to the Apartment/Townhouse is a breach of this Lease.

The lease itself distinguishes between a material breach and non-material breach.

198.   The Landlord routinely shuts-down the rent portal until all bogus utility charges are paid. The Landlord represents to Housing Court that the eviction complaint is based on non-payment of rent. In truth, the Landlord fails to allege that it was the Landlord that caused the alleged nonpayment of rent by freezing the tenant's rent payment portal.

199.   Counsel for the Landlord clarified in an email of September 5, 2023, to Plaintiffs' counsel: "When an eviction action is filed, my client's normal practice is to "turn off" the portal to stop residents from making partial payments in nonpayment cases." [7]

200.   Plaintiffs gave notice that they disputed the validity of bogus utility fees but paid those amounts under protest to avoid facing an eviction complaint.

201.   Deprived of the pretext that Plaintiffs did not pay bogus fees to freeze the rent portal, the Landlord did not have the pretext to wait until the rent is late to then file and serve an eviction complaint. The Landlord and Scott Management were undaunted. They undertook bogus investigations in search of other pretexts to evict and retaliate.

202.   Pretexts for the first eviction complaint in housing court are specified in that complaint and include: allegedly smoking cigarettes on the premises, allegedly using marijuana on the premises, not having a valid accommodation letter for a dog, and other alleged violations.

203.   Plaintiffs did not initially register with RealPage for utility services billing or collections since they did not know that they were so required. Nonetheless, RealPage still generated,

---

[7] On information and belief, Defendants rely on advice of counsel to "turn off" (freeze) the rent portal. Claims relative to these issues are reserved until discovery. These facts are solely within the possession of Defendants and their attorneys.

billed and attempted to collect payment for utility usage/consumption services and related bogus fees and other charges.

204. The first billing statement from RealPage is dated December 9, 2022. It is attached and incorporated by reference herein as Exhibit 3.[8]

205. The balance forward is zero as the first billing statement. Fees and charges at issue in this litigation include a "One-time Activation Fee" of $12, an "Admin Charge" of $4.40, and a "Utility Recovery Charge" of $8.00 for a total disputed charge of $24.40.

206. CenterPoint Energy subsequently sent a billing statement to Plaintiffs. It did not include any bogus charges.

207. A second billing statement from RealPage dated January 10, 2023, is attached and incorporated by reference herein as Exhibit 4.

208. The second billing statement is the start of unlawful collections communications and activities. The amount of the first billing statement of $128.34 is now past due with an added "Late Payment Charge" of $8.00 for a Balance Forward due of $128.34.

209. The second billing statement from RealPage includes Admin. Charge of $4.40 and the Utility Recovery Charge of $8.00 for new and additional bogus charges of $12.40.

210. The second billing statement (and all subsequent billing statements) did not include any of the following statutorily required notices:

• No Notice (in required fonts and format) the communication is an attempt to collect a debt.

• No Notice that for a disputed debt, the consumer can request validation of the debt.

• No Notice that for a disputed debt, there is a process or procedure to challenge the disputed

---

[8] Electricity billing statements from Excel Energy are not included in this litigation. Plaintiffs transferred their prior account from their prior residence over to the address with the Landlord at issue in this litigation.

debt, including an investigation by the debt collector or creditor.

- No Notice that RealPage is licensed as a debt collector in Minnesota.

- No Notice that all information received from debt collection communications or activities will be used to collect the debt.

211.   On the second page of the second billing statement (as well as all subsequent billing statements) specifies that the communication is a bill:

> "This bill is not from ALLIED WASTE SERVICES # 894 or CENTERPOINT ENERGY PO BOX 4671 or CITY OF MINNESTONA or EXCEL ENERGY CO or EXCEL ENERGY-MN.  Charges are billed to residents based upon their lease agreements."…. "Please contact Billing Support at the phone number or email address above for details on calculations, billing inquiries or disputes."

212.   Below the above notation in large fonts is the statement: "Simpler, Safer Utility Bills" followed on the next line with "Conserve your energy with eBill."

213.   A third billing statement is dated February 10, 2023. It is attached and incorporated by reference herein as Exhibit 5. It includes a "Late Payment Charge of $8.00 for the prior month's bill, an "Admin Charge" of $4.40 and a "Utility Recovery Charge" of $16.00.

214.   The Utility Recovery Charge of $16.00 is twice the amount specified in the earlier billing statements. There is no explanation why it was doubled.

215.   A fourth billing statement from is dated March 10, 2023. It is attached and incorporated by reference herein as Exhibit 6. It includes a "Late Payment Charge: of $8.00 for the prior month's bill, an "Admin Charge" of $4.40 and a "Utility Recovery Charge" of $8.00.

216.   A fifth billing statement is dated April 10, 2023 and attached and incorporated by

reference herein. Exhibit 7. It includes a "Late Payment Charge: of $8.00, an "Admin
Charge" of $4.40 and a "Utility Recovery Charge" of $8.00.[9]

217.    CenterPoint Energy sent Plaintiffs a billing statement for gas usage on April 14, 2023.
Page two of its six pages is attached and incorporated by reference herein as Exhibit 8. This
bill represents gas usage for 15 days (November 11/02/22 – 11/17/22) for $21.22.

218.    In contrast, RealPage's billing statement (Exhibit 3) for the first 16 days for the period
from 10/19/2022 – 11/17/2022 is $45.64. RealPage overcharged Plaintiffs approximately
$24.42 for gas usage, almost doubling the amount billed by CenterPoint.

219.    On March 21, 2023, CenterPoint sent Plaintiffs Proof of Natural Gas Service, which is
incorporated by reference herein as Exhibit 9.

220.    CenterPoint Energy sent its first billing statements to Plaintiffs dated April 14, 2023. It
is attached as Exhibit 10 and incorporated by reference herein.

221.    The previous gas amount due is zero. CenterPoint Energy does NOT include any bogus
charges that RealPage added such as "Admin. Fee" of about $4.40, an "Online
Convenience Fee" of about $ 5.00 "Late Payment Fee" of about $8.00 or a "Utility
Recovery Charge" of about $8.00, as part of CenterPoint Energy monthly billing.

222.    On March 21, 2023, RealPage sent a communication to Plaintiffs which is incorporated
by reference herein as Exhibit 11. This communication threatens eviction:

> Portions of your account are over 60 days past due.  In order to make your
> account current, you must immediately mail a check made payable to
> RealPage to P.O. Box 6436, Carol Stream, IL 60197-6436 in the amount

---

[9] Plaintiffs do not have access to the RealPage portal to view May through October 2023 billing statements until
formal discovery.

reference above.  Failure to do may result in the refusal of your next rent payment, **and commencement of eviction proceedings.** (emphasis added).

223.   On March 21, 2003, the same above communication was posted on Plaintiffs' door.

224.   On March 21, 2023. RealPage (under its prior name, AUM RealPage) sent to Plaintiffs

the following, in part.

It is urgent that you contact the utility companies to get your account set up by the deadline of Friday, March 24th, 2023. Otherwise, if it is not done by that date, your Cedar Pointe resident account will be locked, and you will not be able to pay rent until it is resolved…

Exhibit 12.

225.   On or about March 23, 2023, Plaintiffs' counsel had written communications with

Landlord's property manager, Steve Durst. It included in part:

My client made several calls to Center Point today. They were repeatedly told they cannot make any payments to Center Point until its system invoices my clients for services starting November 2, 2022. It is perplexing that you nonetheless insist my clients clear the balance with Center Point before they can access CedarPointe on-line portal to pay their rent, which you now locked them out of today.

226.   On or about March 24, 2023, Plaintiffs' counsel again had written communications with

Landlord's property manager, Steve Durst. It included in part:

Inconsistent and confusing demands by Cedar Pointe is making a simple process complex. Following CedarPointe communications on March 17, 2023, my clients went ahead and opened an active account with Center Point. Center Point told them that they would receive a bill in about a month, with an effective date of November 2, 2023, and only after they receive a bill can they make any payments.

                    * * *

My clients are at risk of making double payments. At CedarPointe's request,

they signed up with Center Point. Their account is active. They will receive and make payments on what they owe to Center Point. Nonetheless,

CedarPointe wants them to also pay CedarPointe at your office or by mail to RealPage. This is not logical, smells illegal, and puts motive into question…

227.   On or about March 24, 2023, the Landlord's Manager, Steve Durst acknowledged by email to Plaintiffs' counsel that Defendants engage in collection activities.  This email is attached as Exhibit 13 and incorporated by reference herein.  It specifies in part:

"The Recovery Fees are for collections on behalf of CenterPoint for non-registration. The "bill" from CenterPoint is included in the AUM RealPage invoice along with their $8.00 recovery fees for the collection's activity for non-registration." (emphasis added)

* * *

The late fees should stand as these statements were sent by the utility monthly to your client's home address like any other residential bill and were not paid.

228.   On or about April 18, 2023, Landlord posted on Tenants' door another notice demanding all amounts specified on the RealPage billing invoice be paid. The notice further specified that in the event those payments were not made in 24 hours, Landlord will freeze Tenants access to its on-line portal to pay the next month's rent, and further threatened immediate eviction for not paying rent.

229.   Tenants attempted to log-on to portal to pay rent on March 23, 2023. The following notice popped up on Tenant's computer screen that the rent on-line portal was frozen:

This account does not allow on-line payments. Please contact your Property Manager for assistance.

Exhibit 14. Tenant/Plaintiffs paid the bogus charges. Although disputed, it gave Plaintiffs to access to the rent portal to pay future rent payments.

230.   On July 2, 2023, Plaintiffs log-on to Landlord's on-line portal to pay rent and again

locked-out. The same message popup -- this account does not allow on-line payments.

Tenant paid the disputed charges under protest to gunlock the rental portal to pay future rent.

231.   Plaintiffs were billed bogus Move Out charges in the amount of $10,751:

| | |
|---|---|
| September rent (even though counsel for the parties agreed that Plaintiffs would move out August 12, 2023 | 2,600 |
| September rent late fee | 208 |
| Refusal to return rent deposit | 500 |
| October rent | 2,600 |
| Stove Range top severely scratched, Range replaced | 722 |
| Microwave has hole in interior window of door. Replace | 254 |
| Phone jack over kitchen island burned and melted | 30 |
| Kitchen countertops, sink, floor and cabinets dirty | 105 |
| All hearing vents, windows sills, window blinds extremely dirty | 140 |
| Food left and fridge and fridge not cleaned | 35 |
| General cleaning of unit, 5 hours x $35/hr | 175 |
| Trash piled against garage wall and trash not cleaned | 35 |

| | |
|---|---|
| Smoke smell remediation in garage – ozone treatment and KILZ paint | 140 |
| Carpet in stairwell and hallways extremely dirty and bedroom carpets dirty and damage. Replace | 2,800 |
| Laundry room, washer, and dryer dirty with a sock in mechanism | 35 |
| Utility charge – gas turned off for non-payment, Adm fee to reinstate and get turned on | 35 |
| Utility charge - Water | 337 |
| TOTAL BOGUS CHARGES | $10,751 |

232.   Relying on these bogus charges, Landlord failed to return Plaintiffs' security deposit.

233.   While Plaintiffs were still in possession of the premises and just before vacating, Plaintiffs made a written request for an inspection of the premises during business hours so the parties can inspect and assess whether the premises were uncleaned and whether there was any damages. The Landlord refused. The Landlord failed to provide any evidence or other proof that the premises were unclean or damaged.

234.   The Landlord is a fiduciary of a tenant relative to rent security deposits. The Landlord is in breach of the lease agreement in failing to return the rent security deposit.

**E.     Allegation of retaliatory eviction**

235.   On or about January 11, 2023, Plaintiffs gave Landlord and other defendants Notice of Claims based on race and disability discrimination. On or about May 16, 2023, Plaintiffs followed-up by giving Landlord and other defendants Notice to Preserve Evidence, which expanded Plaintiffs' claims to include consumer fraud, deceptive trade practices, unfair

collection practices, breach of lease, and improper and illegal utility-related fees including

bogus late fees, administrative fees, and other charges, as more fully specified herein.

236.    In response to receiving the notice of complaints and claims (The Scam) Landlord and

Scott Management orchestrated several overlapping bogus investigations to develop pretexts

for reprisal and retaliation to justify eviction proceedings. The initial bogus investigation

initially claimed Plaintiffs breached the lease by having a pet dog in violation of the no pet

policy, smoking cigarettes in the premises, and burning incense in the premises.

237.    Just less than one month after the Landlord and Scott Management received notice of

bogus fees and related charges including claims for disability discrimination in housing, and

religious discrimination in housing, on or about June 6, 2023, Landlord and Scott

Management served Plaintiffs a Notice of Violation of Lease, Warning of Eviction, And

Offer to Accept Promise to Vacate as Mutual Termination of Lease. This notice alleged

"lease violations issues in connection with your ownership  of  (First Warning Notice)

unauthorized dog in the rental unit", "violation of lease based upon complaints and reports of

smoking in your unit", "smoke orders and marijuana odors associated with your apartment",

allegation that "fire safety equipment, including the smoke detectors, were tampered with

and disabled", that alleged testing of filters in the apartment "showed levels of THC, a

chemical associated with marijuana or cannabis", "ongoing complaints about excessive noise

from your apartment".  The notice makes clear that "[i]t remains our [Management] chief

goal to have your tenancy terminated…"

238.    On or about May 22, 2023, Plaintiffs were served with a second notice of eviction. The

Second Warning Notice include: "…[Y]ou [Plaintiffs] did not have a disability as defined by

law and that Management could not approve an accommodation for you to have an animal at

a no dog building", "a general letter from a health care provider that simply stated the owner

"benefits" from animal ownership would not be acceptable verification", "Someone in your

unit had tampered with and disabled all of the upstairs smoke alarms. The upstairs smoke

alarms had the batteries removed and they were unplugged from the alarm and power

system."

239.   About two months after the Landlord and Scott Management received notice of bogus

fees and claims for disability discrimination in housing and discrimination in religious

housing and on June 16, 2023, Landlord served Notice of Filing of Eviction Complaint

(Eviction Complaint 1). File No. 27-CV-HC-23-4637, Housing Court, Hennepin County.

240.   The grounds specified in Eviction Complaint 1 include:

> "…violations of the lease and Minn. Stat. § 504B.171 as follows: (a) using
> and possessing illegal drugs in the premises in violation of the lease and
> Minn. Stat. § 504B.171. Defendants are using marijuana in the premises and
> the use is illegal and disturbs other resident's use and enjoyment of the
> premises. (b) Defendants are smoking in the premises in violation of the
> lease. (c) Defendants are damaging/tampering/removing life safety
> equipment in the premises. Defendants' conduct of removing life safety
> equipment is a violation of the lease and state law. (d) Defendants have an
> animal in the premises without the consent of Plaintiff in violation of the
> lease.

241.   The filing and serving of this first eviction complaint had ulterior and improper motives:

to find cause to evict Plaintiffs for alleged material breaches of the lease agreement, to extort

current and future bogus payments of bogus fees, to evict Plaintiffs for giving the Landlord

notice of claims for bogus fees, including their individual and class actions claims, and to

implement The Scam to steal and cheat from the Plaintiffs and the Putative Class.

242.    Plaintiffs filed and served their Answer to Complaint, Affirmative Defenses and Counterclaims. It denied that Plaintiff/Landlord has the present right of possession, denied using and possessing illegal drugs on the premises in violation of the lease and Minnesota Stat. § 504B.171, denied using marijuana on the premises and that its purported use disturbs other resident's use and quiet enjoyment of their premises, denied damaging/tampering/ removing life safety equipment on the premises and denied having an animal on the premises without consent of Landlord in violation of the lease.

243.    Plaintiffs asserted several affirmative defenses:

- Landlord fails, in whole or in part, to state a claim upon which relief may be granted.

- Plaintiffs did not materially breach any legal duty, contract owing to the Landlord.

- The purported No Pet Policy does not apply to emotional support animals. Dogs are not considered to be pets when serving as support animals. Landlord failed to provide reasonable accommodations in housing for Plaintiff Eleshea Reid's disability.

- Possession or use of certain products that contain certain amounts of tetrahydrocannabinols (THC) is not illegal in Minnesota, including in residential residences. Landlord does not have any policies and procedures that prohibit use of incense on the premises. Even if it had, Landlord failed to notify Plaintiffs that use of incense on the premise is a violation of the lease agreement. Plaintiffs detrimentally relied on promises and agreements made by Landlord, its management agent and employees subsequent to executing the lease and are equitably estopped from so denying. Landlord materially breached Plaintiffs' right to quiet enjoyment of the premises.

- Grounds specified in the notice of termination of lease, non-renewal of lease, and in the

Complaint are pretext for discrimination against Plaintiffs and violate their Constitutional First Amendment Right to Free of Expression of Religion.

- Landlord is in material breach of Plaintiffs' statutory and lease rights of quiet enjoyment of their premises.

- Grounds specified in the Complaint to evict Defendants are pretexts and reprisal for Defendants' exercise of their statutory protected rights to notify and assert their individual claims and Putative Class claims against Landlord for illegal: late fees, utility fees and other fees that violate consumer protection laws, deceptive trade practices laws, unfair debt collection practices laws, and protection against unlawful landlord practices.

- Plaintiff's claims are barred by waiver and unclean hands.

244. Plaintiffs asserted several counterclaims. The factual predicates include that after receiving invoices for the bogus fees from RealPage (formerly AUM RealTime), for utility services, Plaintiffs gave Landlord notice of disputing many utility-related fees as bogus, improper, and illegal. These included late fees, administrative fees to calculate and generate utility billing statements by the Landlord, and account set-up and convenience fees for on-line payment of utilities paid to the Landlord through AUM RealTime. Essentially, Plaintiffs alleged that the Landlord is stealing from them by deceit, deception, and intentional misrepresentation, all of which are more fully developed herein.

245. The counterclaim cause of actions included: Unlawful Collection Practices, eviction based on religious discrimination, eviction based on disability discrimination, and reprisals.

246. Eviction Complaint 1 was settled and disposed favorably for Plaintiffs. Its terms of settlement were subsequently incorporated into an Order Approving Settlement that was

filed by Housing Court on August 22, 2023, including the following terms:  Tenant can remain in the premises until October 31, 2023, the end date of the lease. Tenant shall not smoke any material in the unit for the remaining tenancy. Landlord agrees that burning of incense is permitted under the lease. Tenants agree the smoke detector equipment is functional and agree not to tamper or remove the equipment without the express written permission of Landlord. Landlord agrees that Tenants are approved for one animal as a reasonable accommodation to use and enjoy the premises and no further documentation is needed. If there is a material breach of the lease, but prior to filling a Writ of Recovery, Landlord "will give [Tenants] 2 business days advance notice of [Landlord's] affidavit of noncompliance if there is a breach of this paragraph before filing it with the Court, with a mail copy to [Tenant's] counsel." Landlord agrees that Tenant will have the ability to pay through the portal and Landlord will not take any action to turn off or exclude Tenants from using the portal through October 31, 2023.

247.   By the end of August 2023, it appeared that all issues raised in Eviction 1 were resolved. Counsels for the Parties understood and agreed that Plaintiffs would make September rent payments in two installments.  Counsels discussed that Plaintiffs were searching for a new place to live and if they found one, Plaintiffs wanted to move out of the current premises around September 15, 2023.  Counsels agreed this would be best for all concerned parties.

248.   Instead of sending the email to Plaintiffs' counsel (which was designed for Plaintiff to cure any alleged breach of the settlement agreement) two days prior to filing Landlord's affidavit of noncompliance as specified in the settlement agreement, Landlord's counsel e-served a letter to Plaintiffs' counsel at 5:54 PM on September 5, 2023, the day before the

Landlord filed the second eviction complaint with a NEW court file # 27-cv-HC-23-6895,

Hennepin County Housing Court, opened on September 6, 2023 (Eviction Complaint Two).

249.   Eviction Complaint Two specifies the ground for the eviction was based on non-payment

of rent for September 2023 in the amount of $2,600.00 plus a late fee of $208.00.

250.   Filing and serving the second eviction complaint had ulterior and improper motives. The

alleged nonpayment is a pretext and retaliation for Plaintiffs exercising their legal right to

give the Landlord notice of claims for bogus fees, including their individual and class actions

claims (The Scam). It constitutes reprisal, retaliation and abuse of process.

251.   On September 25, 2023, Plaintiffs in this instant action (Tenants) filed an Answer to

Compliant, Affirmative Defenses and Counterclaims. It essentially mirrors their earlier

Answer to Complaint One.

252.   At the first court appearance, Landlord withdrew the eviction complaint as no rent was

due. The complaint was dismissal without prejudice as "Tenants moved out after Complaint

filed" and "Housing Court lacks authority to hear counterclaims raised."

253.   Public records for Eleshea Reid reflect an eviction notice for nonpayment of rent.

254.   On September 6, 2023, there was no material breach of the lease for nonpayment of rent.

Paragraph A. RENT, specifies in the first sentence of the lease that rent is due before

midnight of the first day of each month. However, a material breach for nonpayment of rent

occurs only after five late payments of rent within a 12-month period:

> "WARNING: Chronic or repeat late payment of rent creates additional
> burdens and administrative expense for Management even when all late fees
> are paid.  Resident is put on notice that repeat late payment of rent is
> considered a material violation of lease and is a basis for Management to
> refuse to accept a future late payment, even with a tendered late fee, and to
> proceed with an eviction action for repeat late payment of rent, or to non-

renew a Lease at the end of the Lease term. **More than 5 late payments in any 12-month period is considered a material violation of Lease and a basis for eviction and/or termination/non-renewal of Lease at the end of the Lease term.**" (emphasis added).

On September 6, 2023, Plaintiffs (Tenants) were not in material breach of the lease. They were late in their rent payment and late fees apply. They were not in material breach to warrant the second eviction. The eviction complaint was in part retaliatory and in furtherance of The Scam.

255.   Tenants and the Putative Class are not sophisticated consumers of residential housing. The lease is full of technical legalese. It contains ambiguous terms. Tenants did not and do not have resources and financial means to hire a lawyer to negotiate a fair and equitable residential lease with a very sophisticated landlord.

## F.   Landlord breached the lease

256.   The lease specifically permits the burning of incense: "You are permitted to have lit candles, incense, and small decorative oil lamps in your Apartment/Townhomes, … Lease, Community Policies, Para 30, h. at 8 of 12.  Nonetheless, use of incense is one of many unlawful reasons for the Landlord to file eviction complaints against Plaintiffs, which is pretextual and retaliatory for Plaintiffs making good faiths complaints to their Landlord that utility fees were bogus.

257.   Pretexts started on November 15, 2022, with Landlord, dba as Cedar Pointe, sent Plaintiffs an email that threatened eviction for alleged cigarettes and marijuana (not then realizing that the smell was incense, but assume it was cigarette and marijuana) in part:

We have received a smoking complaint for cigarettes and marijuana in your

51

> building. Cedar Pointe is a non-smoking community and no smoking if [sic]
> any kind is allowed by residents, guests, employees or vendors anywhere on
> the Cedar Pointe premises.  This is the final warning – any additional
> complaints will be thoroughly investigated, and the offender will be subject
> to eviction proceedings as defined in your lease.

In truth, this notice was not the "final warning." It was the first.

258.  Landlord or Scott Management have no known published policies or procedures that

prohibit burning of incense in the premises.  The lease specifically permits use of incense.

259.  Plaintiff Reid informed Scott Management in writing that her religious practice includes

burning incense in her home in accordance with her belief, and that she regularly burns

incense and has been doing so since moving into the premises.

260.  On November 15, 2022, smoking packets were sent to all residents in Plaintiffs' building.

On or about November 28, 2022, Cedar Pointe sent another email that specified the in part:

> We sent out a warning email (attached) to all residents of your
> building last week regarding the No smoking Community Policy and
> consequences of violation.  Over the Holiday weekend, we have had
> residents come forward to identify your unit where smoke is coming
> from (garage and master bedroom window).
>
> You signed a No Smoking Policy as part of your lease (Full lease and
> specific Smoke Free Addendum attached). The remedy for a breach
> of this No Smoking Addendum is as follows in section 8 of the
> addendum:
>
> **8. Effect of Breach and Right to Terminate Lease.**  A breach of this
>
> Lease Addendum shall give each party all the rights contained herein,
> as well as the rights in the Lease. A material breach of this Addendum
> shall be a material breach of the Lease and grounds for immediate
> termination of the Lease by Management.
>
> You are hereby put on notice that any further violation of this
> requirement is a breach of Community Policy and a material breach
> of your lease and will result in lease termination.

261.  On November 28, 2022, Plaintiff Eleshea Reid responded:

We do not smoke in our unit as my fiancé mentioned earlier due to my religious beliefs. I light sage and incense for my time of prayer and worship. The level of harassment and making these claims is a violation of our fair housing act. Just because a neighbor complains and is lurking around our unit and harassing us we have to suffer the consequences? Because of our skin color or because of our religion? We are a great family who wants the best life for our son. If we pay our rent just like everyone else and follow the rules of the property then why are being condemned? We mean no harm, please reconsider these accusations. Thank you and have a blessed day.

262.    The next day and on November 29, 2023, Cedar Pointe replied:

Thank you for the clarification. Glad to hear from your [sic] regarding this. Of course we have no problem with your religious traditions and are glad to know the source. We had not heard from you or Michael regarding this and can only act on observations from others in the Community regarding potential violations until or unless a clarification is received.

This is the end of this issue as far [sic] we are concerned.  The potential violation has been removed from your record and there are no other open issues. We will inform others in your building that the issue is resolved and that the odor they detect is from incense that is not prohibited. While we encourage the reporting of disruptive behavior or violations of rules, we will let folks know that harassment is not tolerated.

Thank you, again, for the information and have a wonderful snow-kissed blessed day!

263.    On December 7, 2022, Cedar Pointe notified Plaintiffs that "in order to reduce transmission of smells between units, we will be in your unit tomorrow, Thursday, between 1 and 2 PM to install gaskets on the electrical units of all 3 units."

264.    On January 10, 2023, Cedar Pointe sent an email to Plaintiffs, backtracking its earlier position. It alleged that incense use violated the lease and state law:

We are again receiving complaints of smoking smell coming form [sic] your unit by your neighbors again. The [sic] have documented a number of intermittent times when this occurs.  The timing is about 12:30 – 3:30 AM every other or every few days, and one of the

neighbors has a sensitivity to the smell and cannot sleep on those nights.  These 5-year residents are considering moving due to the lack of sleep and have never experienced any issue of any kind before this. The strongest smell is coming through the bathroom fan vents, but also into the adjoining bedroom.

Even if this is incense, your lease and State law does not allow you to participate in activity that is disruptive to your neighbors. Your lease states in part that you will not:
Permit any noises, music, conduct or action of the Resident, Resident's vehicle, children, enjoinment of the property, rights, comforts, or convenience or other residents or disturbs [reset of line cut-off] AND

…[repeating Paragraph 8 referenced above]

Please evaluate your activities in light of their impact on your neighbors. Further reports of violations will lead to Management reviewing and taking action on its options to remedy the situation for the benefit of the Community peaceful enjoyment.

Plaintiffs requested Cedar Pointe to inform them what Minnesota state law was violated.

Cedar Pointe declined to respond.

265.   On or about April 17, 2023, Landlord's counsel sent Plaintiffs' counsel communications that specified in part:

It is our position that we have resolved, and are not actively pursuing, any complaints that existed in the past about the odors of smoke, and irritation, that were felt by other residents living at this smoke free rental property. My clients did communicate with residents at the property that the burning of incense, and potentially burning other materials like sage was not a lease violation….

266.   Nonetheless, and on May 22, 2023, and without any prior notice, Landlord purportedly serve on Plaintiffs Notice of Termination of Lease and Non-Renewal for October 31, 2023; Notice of Violation of Lease, Option to Transfer to Dog Permitted Building, Other Notices. The notice specifies in part:

A recent inspection of your unit was conducted in connection with build-wide inspections. The inspection disclosed a serious violation of your lease. Someone in your unit had tampered with and disabled all of the upstairs smoking alarms. The upstairs smoke alarms had batteries removed and they were unplugged from the alarm and power system.  Tampering with detectors and fire safety equipment, and a resident failure to immediately report any maintenance need or malfunctioning of any of the smoke detectors in the apartment is a material violation of lease and grounds for lease enforcement up to and including termination of lease or eviction. Management did install new batteries and left the alarms in working condition.

* * *

At the present time, based in part on the various accusations and claims

exchanged, Management is not proceeding to fully enforce the lease or to pursue an action for an eviction of the ongoing violations of the lease. However, Management is not waiving any right under the lease.  If there are additional or further violations, discovered or confirmed, Management reserves all of its rights under the lease. Management is not waiving any right or claim by the notices given herein or the offers made in this letter including the advance notice to you that your tenancy will not be continued when your lease ends…

267.    However, on June 6, 2023, Landlord alleged another pretext to evict Tenants by charging

them with the crime of smoking marijuana in the premises. The Notice of Violation of Lease,

Warning of Eviction, Offer to Accept Promise to Vacate as Mutual Termination of Lease

specified in part:

As part of Management's regular, preventative, maintenance and repair schedule, it removed and serviced filters throughout your building. The old filters from your unit were removed. They were darker, more stained and smelled heavily of smoke and marijuana orders. Out of concerns that any we gave to you of smoking violation in your unit could lead to additional claims by you that Management was making a false accusation about what might have been smoked or burned in your unit, we have a professional lab test a portion of the filter that was removed from your apartment. A confirmatory test recently reported to us, showed levels of THC, a chemical associated with marijuana or cannabis, at a highly elevated level.  We consider this, along with the complaints we have received in the past , and continue to receive from other residents as conclusive proof  that you or your guests, smoked cannabis in the unit, and were only burning some kind of incense

and that the levels of smoking that led to the concentrations of materials in the filter, and potentially led you to disable and disconnect your smoke detectors are material violations of your lease and the Smoke-Free Lease Addendum.

268.    The possession or use of certain products that contain certain amounts of tetrahydro-cannabinols (THC) is not per se illegal in Minnesota, including in residential residences. Tenants absolutely denied smoking marijuana on their premises.

269.    As a result of her religious belief and practice of burning incense, Eleshea Reid and Plaintiff Matthews were threatened, intimidated and harassed under various pretexts over several months, culminating in serving the eviction notice and Summons and Eviction Complaint.

270.    The filing of this first eviction complaint had ulterior and improper motives: to find cause to evict Plaintiffs for alleged material breaches of the lease agreement, to extort current and future bogus payments of bogus fees, to evict Plaintiffs for giving the Landlord notice of claims for bogus fees, including their individual and class actions claims, and to implement The Scam to steal and cheat from the Plaintiffs and the Putative Class.

271.    Landlord has not shown any hardship, much less any "undue hardship", from permitting Plaintiff Reid to practice her Constitutional First Amendment Right to Free Expression of Religion, her statutory and lease rights to quiet enjoyment of her premises.

272.    As a direct result of intentional and deliberate discrimination by Landlord and Scott Management in violation of Tenants Constitutional First Amendment Right to Free Expression of Religion and statutory and lease rights of quiet enjoyment of their premises, Plaintiffs suffered  adverse consequences, and incurred severe and pervasive injuries as a direct result in reconciling the conflict directly caused by Landlord - wanting to live in their

home of choice and right, yet adhere to the tenants of their religion.

273.    These injuries include emotional and psychological injures and are more fully detailed in

the Complaint such as high anxiety, depression, distress, inability to sleep including

insomnia, inability to focus and concentrate, and significant disruptions in Tenant's daily and

religious lives. Plaintiff Reid injuries also include exacerbation of pre-existing depression

and other emotional disabilities which required her to increase prescribed medications and

continue therapy and care. Plaintiffs' other claims for injuries and damages include

additional financial expenses to pay attorney fees and expenses associated with defending the

eviction complaints, and spending time and resources to seek alternative housing.

**G.      Allegations for disability housing discrimination - Failure to Accommodate Dog**

274.    Prior to Plaintiffs moving into the premises and around November 2022, they went on the

Landlord's web page. It did not include any policies and procedures for disability

accommodations. Nor did it provide any notice of Landlord's purported policies and

procedures for pets, including that some buildings in the complex permit specific kinds of

animals, while others do not. The web page simply identified cats and dogs and pricing.

275.    After Tenants moved in, Landlord subsequently informed Plaintiffs of a purported policy

that eighteen (18) of its twenty-five (25) buildings are pet friendly and seven (7) buildings

are reserved for people not wishing to be in a pet friendly environment. Tenants requested

but still have not been given copies of these purported policies and procedures.

276.    As a result of experiences with prior Landlords, Plaintiffs reasonably believed that pets

and pet policies are not relevant to disability accommodations in fair housing. When

Plaintiffs inspected the premises prior to moving in and in the presence of one of Scott

Management's employees, dogs were clearly visible in yards. The employee did not raise the issue of pets during the inspection or during the entire move-in process.

277.   During move-in on November 2, 2022, a Scott Management employee dropped off a copy of the lease, placing an envelope on a counter-top in the premises. The employee could see a dog cage or see and/or hear a dog barking in the premise but did not say or do anything.

278.   While Scott Management was purportedly investigating alleged cigarette and marijuana smoking on the premises, it realized its 'investigation' was not resulting in evidence to warrant an eviction. It embarked on another so called 'investigation'. This time, the Landlord charged Plaintiffs with breach of lease and specifically, breach of the No-Pet Policy and failure to obtain approval for a disability accommodation to have a dog on the premises.

279.   On December 5, 2022, Scott Management provided an emotional support animal (ESA) request. However, the Release section appeared to give the Landlord and/or Scott Management broad authority to ask and seek medical information "related to the requested accommodation." The release specified, in part:

> "By my signature below, you are authorized to provide the information requested on this form about me, or about the minor child, and to answer any follow-up questions related to the requested accommodation."

280.   Plaintiffs had concerns about the release for her medical information:

> …We were unaware that our unit specifically is not pet friendly but you guys have pet friendly units available in your complex just not to us? I also wasn't aware that a person with a mental disability would need to make the disability public. Thus why you guys need my signature to give you access to release my mental health records unfortunately I will not be signing that, I am not granting you guys access to my mental health records.  I have had this ESA with me for the past 3 years he is a full grown 8l lb chihuahua and up to date on shots sadly the second ESA passed away. I have documentation dating back 2 years ago for my service animal.  I attached the letter from my

therapist and all of his credentials are there.  Thank you and have a great day.

281.   The first ESA accommodation letter is October 16, 2020. The medical provider is a licensed Master Social Worker and licensed Independent Clinical Social Worker. The Landlord claimed that this ESA was not current and thus not valid.

282.   After various communications between the Parties about the scope of the medical authorizations, Landlord modifying the release, emailed acknowledgement of receiving the modified release and agreed it was complete, only needing a signature.

283.   Logistical problems arose between Landlord, Plaintiffs and medical provider. Landlord was unable to contact the provider to clarify the initial ESA letter. Plaintiffs had delays in contacting and getting an updated ESA letter since the therapist/provider no longer worked with the same company. There were delays getting an appointment with a new provider due to COVID backlogs in scheduling appointments before issuing an updated ESA.

284.   On January 22, 2023, counsel for Plaintiffs inquired to Scott Management in part:

> My clients do not recall being asked about or signing any documents relative to pets. Please provide my [sic] that documentation.  It appears that you initially took issue that the ESA letter does not have an expiration date. I am not aware this is a legal deficiency. I would appreciate the authority that you rely on.

No such documentation or authority was provided. The email inquiry also requested whether Scott Management has a preferred template for ESA letters.

> It would be helpful and I am thus requesting that Cedar Pointe provide a template or contents that you believe is legally required in her ESA letter. With this information, she will ask her provider to provide a letter, mailing it directly to Cedar Point and providing Eleshea with her copy.

285.   On or about April 5, 2023, counsel for Landlord responded:

> You have been asking my clients questions that I consider inappropriate, to tell you the kind of letter needed to seek verification and approval of an assistance animal.  It is not my client's responsibility to tell you or your client's healthcare provider how verification of a disability, and a disability related need for an accommodation should be written or obtained.

286.   However, a Scott Management employee in an email to Plaintiffs' counsel on May 12, 2023 provided what Scott Management required. It specified in part:

> Although we prefer to have applicants and residents complete our standard verification form to handle a request for any accommodation, we are also willing to reach out to a letter writer to follow-up on a verification request.

> \* \* \*

> Part of our verification process is to ask the provider if they are giving us their professional opinion that the tenant or applicant has a disability, as that term is defined by law. Many providers are willing to write letters that state they support, they recommend, or that their patients would "benefit" from owning an animal. Most individuals receive some emotional support and mental health benefits from owning an animal (there are many studies that show animals can help calm, amuse, and stimulate their owners in a beneficial manner that provide health and wellbeing.

287.   Plaintiff's provider sent the second ESA letter to Landlord on May 4, 2023. It complies with Scott Management ESA requirements as follows:

> Eleshea Reid is currently receiving therapeutic services under my care. I am very familiar with Her mental health history and I have been seeing her since 4 -14 23.  During this time, it has become clear that Eleshea has been struggling with mental health symptoms that are having a negative impact on Her life. She describes it calms her down increase her ability to get out, have activity.

> Research has shown therapeutic benefits of Emotional Support Animals for those that struggle with mental health symptoms. In order to help alleviate some of these difficulties enhance Her ability to live independently, and increase Her level of support, Eleshea has requested that I write this letter with the hope that you can make an accommodation to your pet policy.

Please note that I have not assessed the temperament or behavior of the pet.

Please contact me with any additional questions or concerns.

The provider that executed the second ESA letter is a licensed Psychiatric Mental Health Nurse Practitioner, licensed Advanced Practice Registered Nurse, and Certified Nurse Practitioner.

288.   Plaintiff Reid never executed an authorization for Landlord or Scott Management to make any contact, speak to or request any information from her mental health providers.

289.   Nonetheless, Scott Management unlawfully communicated with Plaintiff Reid health care provider. As a result, Scott Management received a follow-up ESA letter from the same provider that wrote the second ESA letter that specified, in part:

> I [provider name deleted], am unable to provide a statement for Eleshea Reid regarding any disabilities that I, myself have not diagnosed or been given proof of. Eleshea has only been seen by me one time on 04/14/23. In that session, it became clear that Eleshea has been struggling with mental health symptoms that are having a negative impact on her life.
> I support Eleshea in her effort to have an Emotional Support Animal because research has shown the therapeutic benefits of Emotional Support Animals for those that struggle with mental health symptoms. Eleshea explains owning an Emotional Support Animal assists in calming her down and increases her ability to get out and be active.  However I cannot provide any information regarding any disabilities that I have not diagnosed or provided proof of.

290.   As a result of the illegal communications with Plaintiff Reid's provider, and upon information and belief, the provider back-peddled on the earlier ESA. She declined to provide an ESA letter. She was apparently led to believe that she herself had to make the diagnosis or be given proof of the disability, even though she had Reid's medical records.

Scott Management then rejected the second ESA letter and claimed that it must specify that

Reid has a "HUD-approved disability", and since it failed to do so, is defective.

291.    HUD approved guidance template for ESA support letters do not require that ESA letters

must include that the patient has a HUD-approved disability. The HUD-approved template is

attached as Exhibit E and is incorporated by reference herein.

292.    HUD developed its publicly available *Guidance on Documenting an Individual's Need*

*for Assistance Animal in Housing.*

*https://www.hud.gov/sites/dfiles/PA/documents/HUDAsstAnimalNC1-28-2020.pdf* , which is

incorporated by reference herein. The Guidance addresses at page 16: Part III: Criteria for

assessing whether to grant the requested accommodation:

> **Disability-related information.** A disability for purposes of fair housing laws exists when a person has a physical or mental impairment that substantially limits one or more major life activities [footnote omitted]. Addiction caused by current, illegal use of controlled substances does not qualify as a disability [footnote omitted]. As a best practice, it is recommended that individuals seeking reasonable accommodations for support animals ask health care professionals to provide information related to the following:
>
> - Whether the patient has a physical or mental impairment;
>
> - Whether the patient's impairment(s) substantially limit at least one major life activity or major bodily function, and
>
> - Whether the patient needs the animal(s) (because it does work, provide assistance, or performs at least one task that benefits the patient because of his or her disability, or because it provides therapeutic emotion support to alleviate a symptom or effect of the disability of the patient/client, and not merely as a pet).
>
> * * *

293.    Plaintiff Reid is a disabled person as defined by 42 U.S.C. § 3604 *et seq*. and belongs to a

protected group under Minnesota Human Rights Act, Minn. Stat. § 363A.09 *et seq*.

294.   Counsel for Plaintiff Reid represented to Counsel for Scott Management that one of her disabilities is PTSD, which is recognized as a Hud-approved disability.

295.   The acts and omissions described above, constitute:

a)   Denial of housing or making housing unavailable because of disability, in violation of 42 U.S.C. § 3604(f)(1), 3604(f)(2), and 3604(f)(3)(B) and their implementing regulations; and violation of the Minnesota Human Rights Act (HRA), Minn. Stat. § 363A.09 *et seq.*;

b) Discrimination in the terms, conditions, or privileges of the rental of real property, or in the provision of services or facilities in connection therewith, because of disability in violation of 42 U.S.C. § 3604(f)(1) and HRA;

c)   Coercion, intimidation, threats, retaliation, interference with persons in the exercise or enjoyment of, or on account of having exercised or enjoyed, their rights under 42 U.S.C. § 3604(f)(3)(B) and HRA;

d)   Refusal to make reasonable accommodation in rules, policies, practices, or services when such an accommodation may be necessary to afford a person with a disability equal protection to use and enjoy her dwelling in violation of 42 U.S.C. § 3604(f)(3)(B) *et seq.* and HRA;

296.   As a result of the actions of Landlord and Scott Management, Plaintiffs were injured and suffered damages and are "aggrieved person[s]" within the meaning of 42.U.S.C. § 3604 *et seq*. and a belongs to a protected group under the HRA, Minn. Stat. § 363A.09 *et seq*.

297.   The acts and omissions of Landlord and Scott Management, including the acts and omissions described above, constitute disability discrimination, and were directed at Plaintiff Reid because of her disability.

298.   Landlord and Scott Management acts or omissions were intentional, willful, and taken

with disregard of the rights of Plaintiff Reid.

299.   As a result, Plaintiffs Reid and Matthews suffered injuries and damages.

**H.  Class Action Allegations**

300.   Plaintiffs bring claims on behalf of a Putative Class that consists of:

> All individuals that executed a residential lease in Minnesota with
> Scott Management, Inc. or Bader Management, Inc., and locked-out
> from the one-line portal to pay rent until all utility-based fees and
> related charges are fully paid during a period of six years prior to filing
> the Complaint.

301.   Plaintiffs brings claims on behalf of Putative Subclass One that consists of:

> All individuals in the Putative Class that also received notice to evict
> and/or served an Unlawful Detainer Complaint.

302.   Plaintiff brings claims on behalf of Putative Subclass Two that consists of:

> All individuals in the Putative Class or Subclass One that also were
> served a Conciliation Court Complaint.

Excluded from the Putative Class and Subclasses are all employees, officers and directors of

RealPage, YES Energy, Scott Management, or Cedar Pass South, LLC and their parent,

subsidiary companies, predecessors, or successors.


303.   The Putative Class and Subclasses as defined above are identifiable. The Proposed Putative

Class Representatives, Ms. Reid and Mr. Matthews, are members of the Putative Class,

Subclass One and anticipated member of Subclass Two.

304.   The Putative Class and Subclasses are so numerous that joinder of all members is

impracticable. The precise number of the Putative Class and Subclasses is known only to

Defendants. Plaintiffs aver, upon information and belief, that Defendants send thousands of

unlawful collection letters and other unlawful collection activities to thousands of the

approximate 10,000 units that the Landlord owns as described herein.  As a result, the members in the Putative Class are in the thousands.

305.    There are questions of law and fact which are not only common to the Putative Class and Subclasses, but which also predominate over questions affecting only individual Putative Class members. Common and predominating questions for the Putative Class and Subclasses include, but are not limited to:

(a) Whether Defendants conspired to enter into an illegal agreement (The Scam) to steal and cheat from Plaintiffs, the Putative Class and Subclasses;

(b) Whether RealPage (and subsequently YES Energy) acted as a collection agency in its dealing with Ms. Reid and Mr. Matthews and members of the Putative Class and Subclasses;

(c)  Whether RealPage (and subsequently YES Energy) had the necessary license to act as a collection agency or debt collector in Minnesota in its dealings with Ms. Reid and Mr. Mathews and members of the Putative Class and Subclasses;

(d)  Whether RealPage (and subsequently YES Energy) should be enjoined for engaging in any billing or collection practices until compliant with and has the necessary license to act as a collection agency or debt collector;

(e)  Whether RealPage (and subsequently YES Energy) and all other Defendants must disgorge all amounts paid by Ms. Reid, Mr. Matthews and members of the Putative Class and Subclasses from illegal billing and collection practices, including fees and charges denominated as Administrative Charges, Convenience Fees, Late Fees, Utility Recover Charges, One-time Activation Fees, On-time Administrative Fee and the like.

(f) Whether RealPage (and subsequently YES Energy) dealing with Ms. Reid, Mr. Matthews

and the Putative Class and Subclasses violate the FDCPA and MN DCPA*;*

(g)  Whether RealPage (and subsequently YES Energy) dealings with Ms. Reid, Mr. Matthews
and the Putative Class and Subclasses violate Minnesota Prevention of Consumer Fraud Act
(PCFA) and Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 *et seq.;*

(h)  Whether Ms. Reid, Mr. Matthews and the Putative Class and Subclasses are entitled to
restitution and other equitable relief from all Defendants;

(i)  Whether Ms. Reid, Mr. Matthews, and the Putative Class and Subclasses are entitled to
damages and other relief from all Defendants for illegally serving eviction complaints; and

(j)  Whether the Putative Class and subclasses are entitled to damages and other relief from
Defendants for illegally filing and serving Conciliation Court complaints.

306.   The claims of Plaintiffs are typical of the claims of the respective members of the
Putative Class and Subclasses within the meaning of the Rules 23(a) or (b) of the Federal
Rules of Civil Procedure and are based on and arise out of similar facts constituting wrongful
conduct of RealPage (and subsequently YES Energy) and other Defendants.

307.   Plaintiffs will fairly and adequately protect the interests of the Putative Class and
Subclasses within the meaning of the Rules 23(a) and (b) of the Federal Rules of Civil
Procedure. Plaintiffs are committed to vigorously litigating this matter. Further, Plaintiffs
have secured counsel experienced in handling complex litigation and class actions and
anticipate retaining co-counsel as this matter proceeds.

308.   Neither Plaintiffs nor their counsel have any interests which might cause them to not
vigorously pursue this action.

309.   The prosecution of separate actions by individual members of the Putative Class or

Subclasses would create a risk of establishing incompatible standards of conduct and varying adjudications for parties opposing the Putative class and Subclasses, and risk adjudications with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

310.   Class action is a superior method for fair and efficient adjudication of this controversy. The interest of members of the Putative Class and Subclasses in individually controlling the prosecution of separate claims against Defendants is slight because the maximum statutory damages are limited to $1,000.00 with management of the Putative Class claims likely to present significantly fewer difficulties than those presented in many individual claims. The identity of Class and Subclass members may be obtained from Defendants' records.

311.   Prosecution under the FDCPA, MN DCPA, and CFA as a class action is a superior method for fair and efficient adjudications of this controversy given common factual and legal questions, significant costs and expenses, including attorney fees required for rigorous prosecution, and extensive discovery that is common to the Putative Class and Subclasses.

## I.   Public Interest

312.   Public interest is advanced through this lawsuit. The Minnesota legislature declared that a

313.   private right of action for violation of the CPA benefits the public by amended the CFA and adding Subd. 3 to the Act effective August 1, 2023, as follows:

> "Private Enforcement. (a) In addition to the remedies otherwise provided by law, a consumer injured by a violation of sections 325F.68 to 325F.70, in connection with sale of merchandise for personal, family, household, or agricultural purposes, may bring a civil action and recover damages, together with costs and disbursements, including costs of investigations and

reasonable attorney fees, and receive other equitable relief as determined by the court. An action brough under this section benefits the public."

314.    Public interest is served. This Landlord is one of the largest in Minnesota, renting about 10,000 units to the Putative Class and the public. Its policies and procedures affect the housing market in Minnesota. This litigation seeks to stop a fraud that is perpetrated on a large Putative Class and the public.

## CAUSES OF ACTION

## COUNT 1: UNLICENSED AND ENGAGED IN ILLEGAL DEBT COLLECTIONS
### Violation of 15 U.S.C. §1692e

315.    Plaintiffs, in their individual capacities and on behalf of the Putative Class realleges each factual allegation above.

316.    FDCPA, 15 U.S.C. § 1692n (Relation to State Laws) requires all persons subject to the FDCPA to comply with state laws with respect to debt collection practices:

> This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provisions of this subchapter, and then only to the extent of the inconsistency.  For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

317.    Defendants violate Minnesota state law, a predicate per se statutory violation of the FDCPA by conspired and entered into an illegal agreement to engage in illegal debt collections against Plaintiffs and the Putative Class by a third-party debt collector or collection agency in violation of Minnesota statutory license requirements by failing "to hav[e] first applied for and obtained a collection agency license pursuant to the Minnesota Collections Agencies Act, Minn. Stat.§ 332.31 *et seq.*

318.   All Defendants are required by the FDCPA to follow state laws on debt collection practices, including the Minnesota Collections Agencies Act.

319.   RealPage and YES Energy are each a "collection agency" within the meaning of Minn. Stat. § 332.33, Subd. 3 because each is engaged in the business of collection for others any account, bill or other indebtedness.

320.   In collecting and attempting to collect on alleged debts from Plaintiffs and members of the Putative Class, RealPage and YES Energy violate Minn. Stat. § 332.33, Subd. 1 by conducting business in Minnesota as a collection agency without first applying and obtaining a collection agency license, a misdemeanor pursuant to Minn. Stat. § 332.33, Subd. 2.

321.   RealPage and YES Energy engaged in illegal debt collections activities and communications against Plaintiffs and the Putative Class, in part, by threatening illegal evictions and other illegal debt collections activities in violation of the Minnesota Collections Agencies Act, Minn. Stat.§ 332.31 *et seq.,* and the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S. C. § 1692 *et seq.*

322.   RealPage and YES Energy each violated Minn. Stat. § 332.33, Subd. 1 when they claimed, attempted, or threaten to enforce a right with knowledge the right does not exist. They claimed, attempted and threatened to enforce a right to act as a collection agency in dealing with Plaintiffs and members of the Putative Class, when they had no such right. They knew they were not licensed as a collection agency in Minnesota. They knew they had no right to act as an unlicensed collection agency in dealing with Plaintiffs and Putative Class.

323.   Furthermore, each committed per se violations of Minn. Stat. § 332.33, Subd. 1 when engaged in collection agency activity without a collection agency license under Minn. Stat. §

332.33, Subd. 1.

324.   "It is the purpose of this subchapter [of the FDCPA] to eliminate abusive debt collection

practices by debt collectors, to ensure those debts debt collectors who refrain from using

abusive debt collection practices are not competitively disadvantaged and to promote

consistent State Action to protect consumers against debut collection abuse."  FDCPA, 15

U.S.C. § 169e.

325.   All Defendants violated FDCAP, 15 U.S. C. § 1692e because:

"A debt collector may not use any false, deceptive, or misleading
representation or means in connection of any debt. Without limiting the
general application of the foregoing, the following conduct is a violation of
this section:
       * * *
(2) The false representation of –
(A) the character, amount, or legal status of any debt; or
(B) any services rendered or compensation which may be lawfully received
by any debt collector for the collection of a debt.
       * * *
(4)  The representation or implication that nonpayment of any debt will result
in the arrest or imprisonment of any person or the seizure, garnishment,
attachment, or sale of any property or wages of any person unless such action
is lawful and the debt collector or creditor intends to take such action.
(5)  The threat to take any action that cannot legally be taken or that is not
intended to be taken.
       * * *
(10)  The use of any false representation or deceptive means to collect or
attempt to collect any debt or to obtain information concerning a consumer
(11)  The failure to disclose in the initial written communication with the
consumer and, in addition, if the initial communication with the consumer is
oral, that initial oral communication is attempting to collect a debt and that
any information obtained will be used for that purpose, and failure to disclose
in subsequent communications that the communication is from a debt
collector, except that this paragraph shall not apply to a formal pleading made
in connection with a legal action.

326.   The FDCPA creates a broad, flexible prohibition against the use of misleading deceptive,

or false representation in the collection of debts.  *See* 15 U.S.C. § 1692e*; Hamilton v. United*

*Healthcare of Louisiana, Inc.* 310 F.3d 385, 392 (5th Cir. 2002) (citing legislative history reference to the FDCPA's general prohibitions which "will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed.").

327.  As example of conduct that violates Minnesota debt collections licensure laws and in turn violates the FDCPA is a false representation or false implication that a debt collector is duly licensed to engage in debt collections when communicating with a consumer or threaten a consumer. 15 U.S.C. §1692e(2)(A).

328.  The plain language of the FDCPA makes clear that under the strict liability framework, any collection activities by a debt collection agency without a valid debt collection license is a per se statutory violation, which constitutes a misrepresentation of the ability to engage in any collections against a consumer in violation of the FDCPA. *See Randolph v. IMBS, Inc.,* 368 F.3d 726, 730 (7th Cir. 2004) ("§1692e(2)(A) creates a strict-liability rule. Debt collectors may not make false claims, period."); *see also Turner v. J.V.D.B. & Associates, Inc.*, 330 F.3d 991, 995 (7th Cir. 2003 ("under §1692e ignorance is no excuse").

329.  RealPage and YES Energy violated 15 U.S.C. § 1692e(2)(A) by falsely representing their status as a lawful debt collector. Any attempts to collect debt is unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

a)   Determine that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designate the Complaint the operable complaint for class purposes;

b)  Judgment for liability against all Defendants jointly and severally for conspiring to enter into

an illegal agreement that violated 15 U.S.C. § 1692e(2)(A) with respect to Plaintiffs and the class they seek to represent;

c) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications in Minesota until duly licensed as a collection agency in Minnesota;

d) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications or activities in Minesota until they are compliant with the requirements of 15 U.S.C. § 1692e(2)(A);

e) Order all Defendants, jointly and severally, to disgorge to Plaintiffs and the class they seek to represent all payments received as a result of fraudulent and illegal debt collections for six years prior to the filing of the Complaint;

f) Award Plaintiffs and the class they seek to represent actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

g) Award Plaintiffs such additional damages as the Court may allow in the amount of $1,000 pursuant to 15 U.S.C. § 1692a(2)(B)(i);

h) Award all other class members such amount as the Court may allow, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or one percent of the net worth of the debt collectors, pursuant to 15 U.S.C. § 1692k(a)(B)(ii);

i) Award Plaintiffs and the class they seek to represent reasonable attorneys' fees and costs incurred in this action pursuant to 15 U.S.C. § 1692k(a)(3) and Rule 23;

j) Award Plaintiffs and the class they seek to represent pre-judgment and post-judgment

k) interest as permissible by law; and

l) Award such other and further relief as the Court may deem proper.

## COUNT 2: ILLEGAL DEBT COLLECTIONS

## Violation of 15 U.S.C. §1692e)(10)

**330.**   Plaintiffs, in their individual capacities and on behalf of the Putative Class re-alleges each

factual allegation above.

**331.**   Congress recognizing the impossible to foresee every type of deceptive collection

misbehavior expressly included in the FDCPA a catchall provision to prohibit "[t]he use of

any false representation or deceptive means to collect or attempt to collect any debt or to

obtain information concerning a consumer." 15 U.S.C. §1692e)(10).

**332.**   The FDCPA is intended to be "comprehensive, in order to limit the opportunities for debt

collectors to evade the underlying legislative intention." Therefore, the same conduct may

violate multiple sections of the Act. *Clark v. Capital Credit & Collection Servs., Inc.* 460

F.3d 1162, 1178 (9th Cir. 2006) (citing FTC Official Staff Commentary on FDCPA, 53 Fed.

Reg. 50097, 50101).

**333.**   All Defendants violated 5 U.S.C. by conspiring to enter into an illegal agreement to steal

and cheat from Plaintiffs and the Putative Class in violation of 15 U.S.C. §1692e(10) by

using false, deceptive, or misleading representations or means in connection with the

collection of a debt and as a result directly caused the injuries and damages specified herein.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

a)  Determine that this action is a proper class action, certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure and designate the

Complaint the operable complaint for class purposes;

b)  Judgment for liability against all Defendants jointly and severally for conspiring to enter

into an illegal agreement that violated 15 U.S.C. § 1692e(10) with respect to Plaintiffs and the class they seek to represent;

c) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications or activities in Minesota until duly licensed as a debt collector or collection agency in Minnesota;

d) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications or activities in Minesota until they are compliant with the requirements of 15 U.S.C. § 1692e(10);

e) Order all Defendants, jointly and severally, to remit and disgorge to Plaintiffs and the class they seek to represent all payments received as a result of fraudulent and unlawful debt collections for six years prior to the filing of the Complaint;

f) Award Plaintiffs and the class they seek to represent actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

g) Award Plaintiffs such additional damages as the Court may allow in the amount of $1,000 pursuant to 15 U.S.C. § 1692a(2)(B)(i);

h) Order all Defendants, jointly and severally, to remit and disgorge to Plaintiffs and the class they seek to represent all payments received as a result of fraudulent and unlawful debt collections for six years prior to the filing of the Complaint;

i) Award all other class members such amount as the Court may allow, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or one percent of the net worth of the debt collectors, pursuant to 15 U.S.C. § 1692k(a)(B)(ii);

j) Award Plaintiffs and the class they seek to represent reasonable attorneys' fees and costs

incurred in this action pursuant to 15 U.S.C. § 1692k(a)(3) and Rule 23;

k) Award Plaintiffs and the class they seek to represent pre-judgment and post-judgment

interest as permissible by law; and

l) Award such other and further relief as the Court may deem proper.

## COUNT 3: ILLEGAL DEBT COLLECTIONS
### Violation of 15 U.S.C. § 1692f(a)(1)

334. Plaintiffs, in their individual capacities and on behalf of the Putative Class re-alleges each

factual allegation above.

335. All Defendants violated the FDCPA because they conspired to enter into an illegal

agreement that prohibits a "debt collector may not use unfair or unconscionable means to

collect or attempt to collect any debt.  Without limiting the general application of the

foregoing, the following conduct is a violation of this section: (1) The collection of any

amount (including any interest, fee, charge, or expense incidental to the principal obligation)

unless such amount is expressly authorized by the agreement creating the debt or permitted

by law." FDCPA 15 U.S.C. § 1692f(a)(1).

336. All Defendants violated 5 U.S.C. by conspiring to enter into an illegal agreement to steal

and cheat from Plaintiffs and the Putative Class in violation of 5 U.S.C. § 1692f(a)(1) by

using false, deceptive, or misleading representations or means in connection with the

collection of a debt and as a result directly caused the injuries and damages specified herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

a) Determine that this action is a proper class action, certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure, and designate the

Complaint the operable complaint for class purposes;

b) Judgment for liability against all Defendants jointly and severally liable for conspiring and entering into an illegal agreement that violated 15 U.S.C. § 1692f(a)(1) with respect to Plaintiffs and the class they seek to represent;

c) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications or activities in Minesota until duly licensed as a debt collector or collection agency in Minnesota;

d) Enjoin Defendants RealPage and YES Energy from engaging in any debt collection communications or activities in Minesota until they are compliant with the requirements of 15 U.S.C. § 1692f(a)(1));

e) Order all Defendants, jointly and severally, to remit and disgorge to Plaintiffs and the class they seek to represent all payments received as a result of fraudulent and unlawful debt collections for six years prior to the filing of the Complaint;

f) Award Plaintiffs and the class they seek to represent actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

g) Award Plaintiffs such additional damages as the Court may allow in the amount of $1,000 pursuan15 U.S.C. § 1692a(2)(B)(i);

h) Award all other class members such amount as the Court may allow, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or one percent of the net worth of the debt collectors, pursuant to 15 U.S.C. § 1692k(a)(B)(ii);

i) Award Plaintiffs and the class they seek to represent reasonable attorneys' fees and costs incurred in this action pursuant to 15 U.S.C. § 1692k(a)(3) and Rule 23;

76

j)  Award Plaintiffs and the class they seek to represent pre-judgment and post-judgment

    interest as permissible by law; and

k)  Award such other and further relief as the Court may deem proper.

## COUNT 4: ILLEGAL DEBT COLLECTIONS
### Violation of 15 U.S.C. § 1692g)(a) and (b)

337.    Plaintiff repeats and re-alleges each factual allegation contained above.

338.    A key provision of the FDCPA is § 1692g, which requires a debt collector to send, within

        five days of its initial communication with a consumer, a written notice which provides

        information regarding the debt and informs the consumer of his or her right to dispute the

        validity of the debt, and/or request the name and address of the original creditor, within 30

        days of receipt of the notice.  *See* 15 U.S.C. § 1692g(a).

339.    Congress adopted "the debt validation provision of section 1692g" to guarantee that

        consumers would receive "adequate notice of their rights under the FDCPA. *Wilson v.*

        *Quadramed Corp.,* 225 F.3d. 350, 354 (3rd Cir. 2000) (citing *Miller v. Payco-General Am.*

        *Credits, Inc.,* 943 F.2d 482, 484 (4th Cir. 1991)).

340.    This validation requirement is a "significant feature" of the law that aimed to "eliminate

        the recurring problem of debt collectors dunning the wrong person or attempting to collect

        debts which the consumer has already paid." *See Hernandez v. Williams, Zinman & Parham*

        *PC,* 829 F.3d 1068, 1070 (9th Cir. 2016) (citing S. Rep. No. 95-382, at 4 (1977)).

341.    "It is not enough that the dunning letter state the amount of the debt that is due.  It must

        state it clearly enough that the recipient is likely to understand it." *Chuway v. Nat'l Action*

        *Fin. Servs., Inc.,* 362 F.3d 944, 948 (7th Cir. 2004).

342.   All Defendants violated 5 U.S.C. by conspiring to enter into an illegal agreement to steal

and cheat from Plaintiffs and the Putative Class in violation of 15 U.S.C. § 1692g(a) and (b)

by using false, deceptive, or misleading representations or means in connection with the

collection of a debt and as a result directly caused the injuries and damages specified herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

a)  Determine that this action is a proper class action, certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure, and designate the

Complaint the operable complaint for class purposes;

b)  Judgment for liability against all Defendants jointly and severally for conspiring to enter into

an illegal agreement that violated 15 U.S.C. § 1692g(a) and (b) with respect to Plaintiffs and

the class they seek to represent;

c)  Enjoin Defendants RealPage and YES Energy from engaging in any debt collection

communications or activities in Minesota until duly licensed as a debt collector or collection

 agency in Minnesota;

d)  Enjoin Defendants RealPage and YES Energy from engaging in any debt collection

communications or activities in Minesota until they are compliant with the requirements of

15 U.S.C. § 1692g(a) and (b);

e)  Order all Defendants, jointly and severally, to remit and disgorge to Plaintiffs and the class

they seek to represent all payments received as a result of fraudulent and unlawful debt

collections for six years prior to the filing of the Complaint;

f)  Award Plaintiffs and the class they seek to represent actual damages pursuant to 15 U.S.C. §

1692k(a)(1);

g)  Award Plaintiffs such additional damages as the Court may allow in the amount of $1,000

pursuan15 U.S.C. § 1692a(2)(B)(i);

h)  Award all other class members such amount as the Court may allow, without regard to a

minimum individual recovery, not to exceed the lesser of $500,000 or one percent of the net

worth of the debt collectors, pursuant to 15 U.S.C. § 1692k(a)(B)(ii);

i)  Award Plaintiffs and the class they seek to represent reasonable attorneys' fees and costs

incurred in this action pursuant to 15 U.S.C. § 1692k(a)(3) and Rule 23;

j)  Award Plaintiffs and the class they seek to represent pre-judgment and post-judgment

interest as permissible by law; and

k)  Award such other and further relief as the Court may deem proper.

## COUNT 5: BREACH OF LEASE

343.   Plaintiffs repeat and reallege each factual allegation above.

344.   The Landlord has an implied duty and covenant of good faith and fair dealings with

tenants and breached that duty by filing eviction complaints to retaliate against Plaintiffs for

making complaints to the Landlord for bogus fees and a result thereof, directly caused

Plaintiffs and the putative class to incur injuries and damages are more fully set for therein.

345.   The Landlord has a duty to comply with the terms of the lease agreement and breach the

lease by filing eviction complaints against Plaintiffs for burning incense in the premise when

one of the terms of the lease agreement expressly permits burning of incense in the premises

and as a result thereof, directly caused Plaintiffs and the putative class to incur injuries and

damages as more fully set forth herein.

346. The Landlord has a fiduciary with Plaintiffs in relationship with rent deposits held by the Landlord and breached that fiduciary duty by failing to return Plaintiffs' rent deposit, and alternative, failing to exercise good faith of that duty by scheduling a time for both Landlord and Plaintiffs to be present in the premises before Plaintiffs vacated in order to inspect for damages to the property and whether the premises were unclean, and as a result thereof, Plaintiffs and the putative class to incur injuries and damages as set for herein.

347. The Landlord has a statutory duty to specify all fees and other charges that a tenants is responsible for and breach that duty to Plaintiffs by failing to list all of the bogus fees that it charged pursuant to the lease, and as a direct result, Plaintiffs incurred injuries and damages as set forth herein.

348. The Landlord has an implied duty and covenant of good faith and fair dealings with tenants and breached that duty to Plaintiffs by making false, misleading, deceptive and misrepresentation of past or existing material facts or alternatively, concealed by nondisclosure, material facts and as a direct result thereof Plaintiffs and the putative class to incur injuries and damages as set forth herein.

349. Defendants, in part, conspired to enter into an illegal agreement to cheat and steal from Plaintiffs and the Putative Class by deliberately, intentionally, and maliciously failing to disclose to a tenant the right to receive monthly billing statements directly from their gas and utility providers at no charge and instead, only disclosed the option for a tenant to receive Defendants' monthly billing statements with the bogus fees and other charges, and further for a tenant to allegedly consent to bogus fees, and authorize Defendants to engage in collections.

350.   Nondisclosure (the no charge option) was knowingly false of an existing fact when made by Defendants and constitute misrepresentation and/or fraud.

351.   Combining disclosures and nondisclosure is part of the conspiracy to the illegal agreement to cheat and steal from Plaintiffs and the Putative Class. It is and was likely to induce, and in fact did induce, a reasonable tenant to actually and reasonably rely on the combination of disclosed and nondisclosed misrepresentations, to assent and execute the residential lease and/or the purported Third-Party Agreement.

352.   Executing the residential lease and purported Third-Party Agreement was not an arm's length negotiation. Plaintiffs and the Putative Class are unsophisticated consumers. They do not have financial resources to hire an attorney to engage in arm's length negotiations. They were presented by Defendants with a take-it-or-leave-it residential lease and purported Third-Party Agreement.

353.   Defendants are in breach of the lease by failing to disclose all nonoptional fees in the lease, which must be described as the Total Monthly Payment and must be listed on the first page of the lease pursuant to Minn. statute 504B.120.

354.   Defendants are in breach of the lease by filing and serving an eviction complaint based in part on Plaintiffs burning incense in the premises even though the lease agreement expressly permits the burning of incense: "You [tenant] are permitted to have lit candles, incense, and small decorative oil lamps in you Apartment/Townhomes …" and even through Plaintiffs informed the Landlord and Scott Management that they burned incense as part of their religious practices.

355.   Defendants fraudulent induced Plaintiffs and the Putative Class to execute the residential

lease and the purported Third-Party Agreement because Defendants in part (1) knowingly misrepresented the character or essential term of the proposed residential lease (no charge and charges for the monthly billing statements), (2) Defendants intended the combination of disclosures and nondisclosures to be intentional, deliberate, and malicious misrepresentations and omissions of material facts to trick and deceive, which resulted in not mutual meeting of the mind and thus no mutual assent to enter into the lease and/or Third-Party Agreement, (3) Defendants knew or had reasonable opportunity to know of the lack of assent of essential terms of the proposed lease and/or Third-Party Agreement. The misrepresentations and omissions caused Plaintiffs and the Putative Class to lack assent. As a result, Plaintiffs are injured and incurred damages as specified herein and in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

a) Judgment for liability against all Defendants, jointly and severally, that the residential lease and purported Third-Party Agreement are null and void as part of a conspiracy to enter into an illegal agreement with Plaintiffs and the class that they seek to represent;

b) Order all Defendants, jointly and severally, to disgorge to Plaintiffs and the class they seek to represent all payments received as a result of fraudulent and unlawful debt collections for six years prior to the filing of the Complaint for any fees denominated as an "Admin Fee", "Convenience Fee", "Late Payment Charge", "Utility Recover Charge", "One-time Activation Fee", "One-time Administrative Fee", and the like;

c) Order all Defendants, jointly and severally liable for all special damages as a direct result of Plaintiffs and the Putative Class refusing to pay bogus utility-based bogus fees and then

being forced to defend and litigate eviction proceedings and Conciliation Court complaints

brought by Defendants to enforce the bogus fees, as well as the resulting injuries and

damages as specified herein as a result of filing and serving the eviction complaint and

Conciliation Court complaint;

d) Judgment against all Defendants jointly and severally for pre-judgment and post-judgment

interests, and Plaintiffs' costs disbursements, and attorney fees pursuant to law.

e) For such other and further legal and equitable relief as the Court deems just and proper.

## COUNT 6: PREVENTION OF CONSUMER FRAUD ACT
### (Violation of Minn. Stat. § 325F.69)

356.   Plaintiffs repeat and reallege each factual allegation above.

357.   Pursuant to Minnesota Statutes Section 325F.69, subdivision 1:

> The act, use or employment by any person of any fraud, false pretense,
> false promise, misrepresentation, misleading statement or deceptive
> practice, with the intent that others rely thereon in connection with
> the sale of any merchandise, whether or not any person has in fact
> been misled, deceived, or damages thereby, is enjoinable as provided
> in section 325D.70

Defendants also engaged in common law fraud and misrepresentation.

358.   The term "merchandise" within the meaning of Minnesota Statute Section 325F.69

includes services and real estate. Minn. Stat. § 325F.68, subdivision 2 (2018).

359.   Minnesota recognizes that "[t]he Prevention of Consumer Fraud Act, Minn. Stat.

Sec. 325F.68-325F.70 (1988), applies to deceptive landlord practices in leased

housing." *Love v. Amsler*, 441 N.W. 2d 555 (Minn. App. 1989) (Syllabus by the

Court).

360.   'State anti-fraud measures are '[p]redicated on a legislative recognition of the

unequal bargaining power of opposing forces in the marketplace' and are designed to '[p]lace on more equal terms seller (landlord) and consumer (tenant) and '[t]o ensure the fairness of market transactions.' *Monumental Properties,* 459 Pa. at 457-58, 329 A. 2d. 812)".

361.    "Because the Act is remedial it should be '[c]onstrued liberally for advancement of the remedy.'" *Governmental Research Bureau, Inc. v. Borgen*, 224 Minn. 313, 323, 28 N.W. 2d 760, 776 (1947)" *Love* at 559.

362.    The Minnesota Prevention of Consumer Fraud Act has been relied on by Minnesota Attorney General to file a civil complaint against a Minnesota landlord for allegedly stripping Minnesota consumers (tenants) of their legal rights through illegal and deceptive rental practices for an eviction-for-profit scheme, including illegal late fees. *State of Minnesota v. Steven Meldahl et al.,* 27-CV-16424 (Hennepin County Dist. Ct. 9/30/2019).

363.    The Minnesota Prevention and Consumer Fraud Act was recently amended, with an effective date of August 1, 2023, to provide a private right of action to a single person harmed by violation of the Act by adding Subd.3: "Private Enforcement. (a) In addition to the remedies otherwise provided by law, a consumer injured by a violation of sections 325F.68 to 325F.70, in connection with sale of merchandise for personal, family, household, or agricultural purposes, may bring a civil action and recover damages, together with costs and disbursements, including costs of investigations and reasonable attorney fees, and receive other equitable relief as determined by the court. An action brough under this section benefits the public."

364.     Defendants, individually and collectively, conspired to enter into an illegal

agreement to steal and cheat from Plaintiffs and the Putative Class by repeatedly

violated Minnesota Statutes section 325F.69, subdivision 1, by engaging in fraud,

false pretenses, false promises, misrepresentation, misleading statements, and

deceptive practices, as described in this Complaint, with the intent that others rely

thereon in connection with the rental of Landlords' residential properties. Those

illegal practices include, Defendants conspiracy to enter into an illegal agreement and

adoption of an implementation plan to steal and cheat from Plaintiffs and the Putative

Class to, in part, charge bogus fees and other charges as herein specified that are

otherwise free and at no cost to a residential tenant when the tenant receives a

monthly billing statement directly from their gas and electricity utility providers

respectfully; engage in third-party collections communications and activities without

a Minnesota license as a duly debt collector or collection agency; engage in illegal

debt collections activities, including to illegally threaten to turn off a tenant's on-line

rent payment portal for not paying utilities bogus fees and other fees; filing and

serving eviction complaints under the pretext a tenant has not paid rent when in truth,

it is impossible for the tenant to pay the rent because the Landlord and Scott

Management intentionally, deliberately, and maliciously shut-off the rent payment

portal until all of the bogus utility fees are paid; failed to inform the consumer that the

third-party debt collector is duly licensed to engage in debt collections in Minnesota;

failed to adhere to statutory required requirement to notify the consumer that the

communications is an attempt to collect a debt, the right of the consumer to receive

validation of the debt, the right to dispute the debt, and the right to an investigation on the validity of the alleged debt.

365.   Defendants conduct, practices, and actions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325F.69.

366.   Defendants are liable in their individual and collective capacity entered into the illegal agreement and its implementation plan to steal and cheat from Plaintiffs and the Putative Class and as a result, these and other actions taken constitute multiple separate violations of Minnesota Statutes section 325F.69.

367.   Defendants Landlord and its affiliated entities (including Scott Management) are individually and collectively liable due to failure to observe corporate formalities.  In truth, all Defendants operate as one entity with interlocking equity holders, board of directors and senior officers, with the same address for principal place of business, registered officers, and registered agent for service of process.

368.   As a direct result of Defendants illegal conduct and practices, Plaintiffs and the Putative Class incurred injuries and damages and specified herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Putative Class respectfully asks this Court to award judgment against Defendants as follows:

a)  Declare that Defendants actions, as set forth above, constitute a conspiracy to enter into an illegal agreement to defraud Plaintiffs and the class they seek to represent with multiple, separate violations of Minnesota Statutes section 325F.69, subdivision 1.

b)  Judgment for liability against all Defendants, individually and severally, for their conspiracy

to enter into an illegal agreement to engage in deceptive practices and making false and misleading statements in violation of 325F.69, subdivision 1.

c) Enjoin Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participating with them, from engaging in deceptive practices and making false or misleading statements in violation of Minnesota Statutes section 325F.69, subdivision 1.

d) Enjoin Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participating with them, from charging any of the bogus fees and other fees and charges as specified in the Complaint.

e) Award Plaintiffs for an amount in excess of seventy-five thousand dollars ($75,000) for their individual injures and damages as specified herein.

f) Award all class members such amount as the Court may allow, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or one percent of the net worth of the debt collectors pursuant to 15 U.S.C. § 1692k(a)(B)(ii).

g) Judgment against all Defendants jointly and severally for pre-judgment and post-judgment interests, and Plaintiffs' costs, disbursements, and attorney's fees.

h) For such other and further legal and equitable relief as the Court deems just and proper.

## COUNT 7: ABUSE OF PROCESS

369. Plaintiffs repeat and reallege each factual allegation above.

370. Defendants used the regular and customary legal process of filing and serving an eviction

complaint against Plaintiffs with several ulterior motive. First, the eviction complaint is an tool of extortion to implement and enforce the conspiracy of entering into an agreement (The Scam) to steal and cheat from Plaintiffs as more fully specified in the Complaint.

371.    Second, filing and serving the eviction complaint is a misuse or prevision of the legal process in part because nonpayment of rent (the primary reason for the eviction complaint) is a fraud on Plaintiffs and Housing Court. There is no true and traditional nonpayment of rent – in that Plaintiffs did not and could not pay rent. The fraud is that Plaintiffs tried desperately to pay rent but was prevented from doing so because Defendants that shut-down Plaintiffs' access to the rental portal which made it impossible to pay rent. The fraud includes that the alleged nonpayment of rent is a pretext to file and serve the eviction complaint. In truth, the filing and serving of the complaint is part of the fraud and extortion to evict for not paying the bogus utility fees.

372.    Third, the filing and serving of the complaint had an ulterior and illegal motive because there was in part no material breach to the lease. A late payment of rent is not a material breach to justify an eviction complaint. The lease requires five late payments of rent within a 12-month period before late payments evolve from a non-material breach into a material breach. Plaintiffs were served the bogus eviction complaint after being just five days late on rent and without any history of prior late payments in rent. With this knowledge and nonetheless filing the eviction complaint, Defendants intentionally and fraudulently misuse the legal process.

373.    Plaintiffs (tenants) prevailed in the first eviction complaint as follows:

 • The Landlord requested an immediate eviction of Tenants. The Parties settled by

agreeing that Plaintiffs can remain in the premises until the October 31, 2023, the end date `of the lease, as specified in the lease.

- The Landlord requested immediate eviction based on the Plaintiffs allegedly smoking cigarettes in the premises. Plaintiffs disputed this allegation. The Parties settled with the Plaintiffs agreeing to not smoke for the remaining tenancy.

- Landlord filed for eviction based in part on the Plaintiffs burning incense in the premises. The Parties settled with Landlord agreeing that burning of incense is permitted.

- The Landlord requested eviction based on the Plaintiffs allegedly tampering with smoke detector equipment. The Plaintiffs disputed this allegation. The Parties settled with the Plaintiffs agreeing to not tamper or remove any smoke detector equipment without the express written permission of Landlord.

- The Landlord requested eviction based on allegations that the Plaintiffs were not approved to have a dog on the premises. The Parties settles with the Landlord agreeing that Tenants are approved for one animal as a reasonable accommodation to use and enjoy the premises and no further documentation is needed.

374.   Plaintiffs (tenants) prevailed in the second eviction complaint. The Landlord requested immediate eviction based on non-payment of rent. It was dismissed at the first hearing after the Landlord confirmed that Plaintiffs had in fact paid rent owed and vacated the premises.

375.   As a result of Defendants filing the two eviction complaints, Plaintiffs incurred injuries, including emotional injuries with physical manifestations as specified in this Complaint, and damages, including financial damages, also specified in this Complaint.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Putative Class respectfully asks this Court to award judgment against Defendants as follows:

a) Judgment for liability against all Defendants jointly and severally for conspiring to enter into an illegal agreement to engaged in abuse of process;

b) Vacate all judgments entered in favor of Cedar Pass South, LLC six years prior to filing this Complaint for alleged nonpayment of rent where judgment was based in part on Defendants' fraudulent representations that Plaintiff and the Putative Class materially breached the lease by nonpayment of rent;

c) Vacate all judgments entered in favor of Cedar Pass South LLC six years prior to the filing of this Complaint as specified in Paragraph b) above and subsequently followed up with the filing or service of a Conciliation Court complaint for alleged Move-Out Charges, costs, disbursements and attorney fees;

d) Order expungement of all court filings identified in Paragraph b) and c) above and order all Defendants, jointly and severally pay for all costs, disbursements and attorney fees associated with those expungements;

e) Order all Defendants jointly and severally to pay all reasonable costs, disbursements, and attorney fees incurred by Plaintiffs and the Putative Class to defend the eviction complaint and Conciliation Court complaints identified in Paragraphs b) and c) above;

f) Order Defendants to remit and disgorge all monies paid by Plaintiffs and the Putative Class as a result of judgments entered by the court as specified in Paragraphs b) and c) above;

g) Judgment against all Defendants, individually and jointly, for pre-judgment and post-judgment interests, and Plaintiffs' costs, disbursements, and attorney's fees;

h) For such other and further legal and equitable relief as the Court deems just and proper.

## COUNT 8: RETALIATION

**376.** Plaintiffs repeat and reallege each factual allegation above.

**377.** On or about January 11, 2023, Plaintiffs gave the Landlord Notice of Claims and disability discrimination.  After engaging in additional investigation and research and on or about May 16, 2023, Plaintiffs gave the Landlord Notice to Preserve Evidence, which expanded notice of claims to include violations that flow from The Scam as more fully detailed in the Complaint, including the charging of illegal and bogus utility-related fees, late fees, administrative fees, account setup fees, convenience fees and the like that Landlord and RealPage billed Plaintiffs in the monthly billing statements.

**378.** The notice of claims also included notice of class action and notice of Fair Housing disability discrimination for the Landlord unreasonably refusing to grant an accommodation to have a dog on the premises to cope with Plaintiffs' Reid mental disabilities.

**379.** The notice of claims also included notice of Fair Housing discrimination by the Landlord for unreasonably denying Plaintiffs the right to burn incense in the premise as part of her religious beliefs, which also violate Plaintiffs' Constitutional First Amendment Right of Freedom of Expression of Religion.

**380.** As a direct result of making these claims against the Landlord for violations of the lease agreement and her statutory rights, including common law rights, the Landlord and Scott Management orchestrated bogus investigations to find a pretext to evict Plaintiffs for making her complaints against the Landlord and Scott Management.

381.    On about June 6, 2023, the Landlord, through its property manager, Scott Management

sent Plaintiffs Notice of Violations of Lease, Option to Transfer Dog Permitted Building,

Other Notices and constitutes, in part, retaliation. Landlord and Scott Management freezing

of Plaintiffs' rent payment portal until all amounts alleged due, which include the bogus fees

and other fees were fully paid constitute in part retaliation. Freezing the rental portal made it

impossible for Plaintiffs to pay the next month's rent when it came due at the first of the next

month and constitutes in part extortion.

382.    In attempts to avoid a threatened eviction for bogus fees that were not paid, Plaintiffs

gave notice of disputing the bogus fees but paid them under protest.

383.    Landlord and Scott Management were not to be deterred in their efforts to find a pretexts

to evict Plaintiffs which also in part constitute retaliation.

384.    The landlord served notice and subsequently filed an eviction complaint on August 22,

2023, alleged breach of contract for the following alleged breaches of the lease that are in

part pretextual and retaliatory:[10]

- Plaintiffs use and possess illegal drugs in the premises

- Plaintiffs smoke cigarettes in the premises

- Plaintiffs use marijuana in the premises

- Plaintiffs are damaging, tampering, removing left safety equipment in the premises

- Plaintiffs have an animal in the premises without consent.

385.    The Landlord and Scott Management were not to be deterred in their attempts to find

---

[10] See Cedar Pass South, LLC. v. Elesha Reid, Michael Matthews, et al., 27-CV-HC-23-4637, Fourth Judicial
Court, Hennepin County (August 22, 2023).

pretexts to again attempt to evict Plaintiffs and retaliate after the first eviction complaint as

settled favorably for Plaintiffs.  A second eviction complaint was filed September 6, 2023.[11]

386.   The second eviction complaint alleged eviction for nonpayment of rent for September

rent in the amount of $2,600 and a late fee of $208.

387.   There was no material breach of the lease.  The second complaint failed to allege there

was 5 late payments within a 12-month period.

388.   The second eviction complaint was in part pretextual and retaliatory as there was no

material breach for nonpayment of rent to justify immediate eviction.

389.   The second eviction complaint is pretextual and retaliatory for Plaintiffs informing the

Landlord and Scott Management of notice of claims against Defendants for conspiring to

enter into an agreement charge bogus fees (The Scam).

390.   The two eviction complaints are pretextual and retaliation and resulted in injuries and

damages to Plaintiffs are more fully detailed in this Complaint.

391.   As a result, Landlord retaliation against Plaintiffs pursuant to Minnesota Statute Section

504B et seq. and common law, because notices to vacate or quit, and filing of eviction

notices were intended in whole or part as a penalty for tenant's good-faith attempt to secure

rights under the lease or under law with resulting injuries and damages as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Putative Class respectfully asks this Court to award

judgment against Defendants as follows:

---

[11] See Cedar Pass South, LLC. v. Elesha Reid, Michael Matthews, et al., 27-CV-HC-23-6997, Fourth Judicial
Court, Hennepin County (September 6, 2023).

a) Judgment for liability against all Defendants jointly and severally for conspiring to enter into an illegal agreement to retaliate against Plaintiffs and the class they seek to represent by Defendants' filing and serving unlawful evictions complaints against Plaintiffs for making complaints to the Landlord or its property manager Scott Management for bogus fees;

b) Vacate all judgments entered in favor of Cedar Pass South, LLC six years prior to the filing of this Complaint for alleged nonpayment of rent where judgment was based on Defendants' fraudulent representations that Plaintiff and the Putative Class materially breached the lease by alleged nonpayment of rent when in fact evictions were retaliation for not paying bogus utility-based fees and other fees;

c) Vacate all judgments entered in favor of Cedar Pass South LLC six years prior to the filing of this Complaint as specified in Paragraph b) above and subsequently followed up with the filing or service of a Conciliation Court complaint for alleged Move-Out Charges, costs, disbursements and attorney fees;

d) Order expungement of all court filings identified in Paragraph b) and c) above and order all Defendants, jointly and severally pay for all costs, disbursements and attorney fees associated with those expungements;

e) Order all Defendants jointly and severally to pay all reasonable costs, disbursements, and attorney fees incurred by Plaintiffs and the Putative Class to defend the eviction complaint and Conciliation Court complaints identified in Paragraphs b) and c) above;

f) Order Defendants to remit and disgorge all monies paid by Plaintiffs and the Putative Class as a result of judgments entered by the court as specified in Paragraphs b) and c) above;

g) Judgment against all Defendants, individually and jointly, for pre-judgment and post-

judgment interests, and Plaintiffs' costs, disbursements, and attorney's fees;

h) For such other and further legal and equitable relief as the Court deems just and proper.

## COUNT 9: DISABILITY DISCRIMINATION IN FAIR HOUSING

392.   Plaintiffs repeat and reallege each factual allegation above.

393.   The Landlord and Scott Management refused to make reasonable accommodations to its

no-pet policy as more fully specified in this Complaint and includes in part: a) The first ESA

letter dated October 16, 2020 did not include an expiration date (not a legal requirement). It

is a pretext by Landlord and Scott Management to claim the ESA was deficient. b) Plaintiffs

asked the Landlord and Scott Management to provide a preferred template but was refused.

On April 5, 2023 counsel for the Landlord indicated that the request is 'inappropriate."

However, Scott Management specified what was acceptable on May 12, 2023:

> Although we prefer to have applicants and residents complete our
> standard verification form to handle a request for any accommodation,
> we are also willing to reach out to a letter writer to follow-up on a
> verification request.

> * * *

> Part of our verification process is to ask the provider if they are giving
> us their professional opinion that the tenant or applicant has a
> disability, as that term is defined by law. Many providers are willing
> to write letters that state they support, they recommend, or that their
> patients would "benefit" from owning an animal. Most individuals
> receive some emotional support and mental health benefits from
> owning an animal (there are many studies that show animals can help
> calm, amuse, and stimulate their owners in a beneficial manner that
> provide health and wellbeing.

c).  The second ESA letter to Landlord on May 4, 2023 complied with and is consistent with

Scott Management specified requirements:

Eleshea Reid is currently receiving therapeutic services under my care. I am very familiar with Her mental health history and I have been seeing her since 4 -14 23.  During this time, it has become clear that Eleshea has been struggling with mental health symptoms that are having a negative impact on Her life. She describes it calms her down increase her ability to get out, have activity.

Research has shown that therapeutic benefits of Emotional Support Animals for those that struggle with mental health symptoms. In order to help alleviate some of these difficulties enhance Her ability to live independently, and increase Her level of support, Eleshea has requested that I write this letter with the hope that you can make an accommodation to your pet policy.

Please note that I have not assessed the temperament or behavior of the pet.

Please contact me with any additional questions or concerns.

The provider of the second ESA letter is a licensed Psychiatric Mental Health, Nurse

Practitioner, licensed Advanced Practice Registered Nurse, and Certified Nurse Practitioner.

d).  Undeterred and without an executed authorization from Elesha Reid, and without her

providing her provider an authorization to speak to any third-party, including her Landlord, the

Landlord and Scott Management nonetheless communicated with the provider and obtained the

following revision to the second ESA letter, as follows:

I [provider name deleted], am unable to provide a statement for Eleshea Reid regarding any disabilities that I, myself have not diagnosed or been given proof of. Eleshea has only been seen by me one time on 04/14/23. In that session, it become clear that Eleshea has been struggling with mental health symptoms that are having a negative impact on her life.
I support Eleshea in her effort to have an Emotional Support Animal because research has shown the therapeutic benefits of Emotional Support Animals for those that struggle with mental health symptoms. Eleshea explains owning an Emotional Support Animal assists in calming her down and increases her ability to get out and be active.  However I cannot provide any information regarding any disabilities that I have not diagnosed or provided proof of.

96

e).  Undeterred, the Landlord and Scott Management alleged that the follow-up ESA letter MUST specifically include that Plaintiff Eleshea Reid has a "HUD-approved disability", and failing to so specify is defective.

394.   By taking the actions set forth above and as more fully specified in this Complaint, the Landlord and Scott Management:

a.  discriminated in the rental, or otherwise made unavailable or denied a dwelling to a renter because of a disability, in violation of 42 U.S.C. § 3604(f)(1) and violation of the Minnesota Human Rights Act (HRA), Minn. Stat. § 363A.09 *et seq*.;

b.  discriminated in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of disability, in violation of   42 U.S.C. § 3604(f)(2) and violation of the Minnesota Human Rights Act (HRA), Minn. Stat. § 363A.09 *et seq*.;

c.  refused to make reasonable accommodation in rules, policies, practices, or services, when such an accommodation may be necessary to afford a person with a disability equal opportunity to use and enjoy her dwelling in violation of 42 U.S.C. § 3604(f)(3)(B) and violation of the Minnesota Human Rights Act (HRA), Minn. Stat. § 363A.09 *et seq*.; and

d.  Coerced, intimidated threatened or interfered with person in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under the Fair Housing Act, in violation of 42 U.S.C. § 3617.

395.   As a result of the actions by the Landlord and Scott Management as set forth above, Plaintiffs has been injured and has suffered damages, and is an "aggrieved person" within the

meaning of 42 U.S.C. § 3602(i) and a protected person of the Minnesota Human Rights Act (HRA), Minn. Stat. § 363A.09 *et seq*.;

396.   Landlord and Scott Management actions were willful, intentional, and in reckless disregard of law and part of implementing The Scam described in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Putative Class respectfully asks this Court to award judgment against Defendants as follows.

1.   Enter judgment for liability against Defendant Cedar Pass South LLC and Defendant Steven Scott Management, Inc. discriminatory conduct violates the Fair Housing Act.

2.   Enter judgment for liability against all Defendants, jointly and severally, for engaging in a conspiracy to enter into an agreement to steal and cheat (The Scam) against Plaintiffs.

3.   Enjoin Defendants Cedar Pass South LLC and Defendant Steven Scott Management, Inc., their agents, employees, successors (including Bander or Bander Companies), and all other persons in active concert or participation with any of them from discrimination on the basis of disability, in violation of the Fair Housing Act, and failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future;

4.   Judgment against all Defendants, individually and jointly, for pre-judgment and post-judgment interests, and Plaintiffs' costs, disbursements, and attorney's fees;

5.   For such other and further legal and equitable relief as the Court deems just and proper.

## Trial By Jury

Plaintiffs are entitled to and hereby demand a trial by jury.

Date: April 29, 2024

Respectfully submitted,                        s/ Earl Singh
                                               Earl Singh (MN# 0178263)
                                               Singh Advisors, LLC
                                               711 Smith Avenue South
                                               St. Paul, MN  55107
                                               651-647-6250 (phone)
                                               earl.singh@singhadvisors.com

## VERIFICATON

We, Elesha Reid and Michael Matthews, declare under penalty of perjury and under the laws of the United States of America that we have read the foregoing Complaint and Attachments and the facts asserted herein are true and accurate based on personal knowledge or on information and belief.

Date: April 29, 2024        s/Eleshea Reid            s/Michael Matthews